### UNITED STATES DISTRICT COURT
### DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ———————————————————— ) | |
| K. ERIC MARTIN and RENÉ PÉREZ,            ) | |
| ) | |
| Plaintiffs,    ) | |
| ) | |
| v.                                        ) | |
| ) | |
| WILLIAM EVANS, in his Official            ) | Civil Action |
| Capacity as Police Commissioner   ) | No. 16-11362-PBS |
| for the City of Boston, and DANIEL ) | |
| F. CONLEY, in his Official         ) | |
| Capacity as District Attorney for  ) | |
| Suffolk County,                           ) | |
| ) | |
| Defendants.    ) | |
| ———————————————— ) | |

### MEMORANDUM AND ORDER

March 13, 2017

Saris, C.J.

Two civil rights activists bring an as-applied constitutional challenge to the Massachusetts Wiretap Statute, Mass. Gen. Laws ch. 272, § 99. The complaint, brought under 42 U.S.C. § 1983, claims that Section 99, as applied to the secret recording of police officers engaged in their duties in public places, violates the First and Fourteenth Amendments.[1] The plaintiffs seek declaratory and injunctive relief.

———————————————

[1]      Another plaintiff has raised facial and broader as-applied challenges to Section 99 before this Court in Project Veritas Action Fund v. Conley, No. 16-cv-10462-PBS (D. Mass. filed March 4, 2016). That case is pending.

1

The defendants are William Evans, the Commissioner of the Boston Police Department ("BPD"), and Daniel Conley, the Suffolk County District Attorney. Evans and Conley each move to dismiss. Evans raises three issues: lack of standing, failure to state a First Amendment violation, and lack of municipal liability. Conley raises two issues: lack of standing and <u>Pullman</u> abstention.

The Court holds that: (1) the plaintiffs survive the standing challenge; (2) the complaint adequately states a claim of municipal liability; (3) <u>Pullman</u> abstention is unwarranted; and (4) the plaintiffs have adequately stated a First Amendment claim. Both motions to dismiss (Docket Nos. 16, 18) are **<u>DENIED</u>**.

**<u>FACTUAL BACKGROUND</u>**

For purposes of the motions to dismiss, the facts are taken as alleged in the complaint.

Eric Martin works for a Boston-based nonprofit organization and soup kitchen. He is also a civil rights activist who regularly participates in political demonstrations throughout Boston. Martin alleges that about once a week, he openly records BPD police officers performing their duties in public. He also allege that about once a month, he has wanted to secretly record BPD police officers performing their duties in public but has refrained from doing so for fear of prosecution under Section 99. For instance, Martin has wanted to secretly record police

2

officers when he is alone because of fear that open recording would provoke a hostile response from the police officer that threatens his physical safety. Martin alleges that this fear is based on his personal experiences, including a December 2011 incident in which a BPD police officer shoved him to the ground and threatened to arrest him for taking his picture.

Martin also regularly organizes and teaches "Know Your Rights" trainings. At these training sessions, Martin instructs people that there is a First Amendment right to record police officers performing their duties in public but that they should only make such a recording if they feel safe doing so openly. If not for Section 99, he would instruct others to make secret recordings in such situations.

René Pérez is also a civil rights activist who regularly participates in political demonstrations throughout Boston. He alleges that he has wanted to secretly record BPD police officers performing their duties in public on numerous occasions, including during traffic stops when he is alone, but that he has refrained from doing so for fear of prosecution under Section 99. The reason he would want the recording of police officers to be secret in some instances is fear that open recording would provoke a hostile response that threatens his physical safety. He alleges that this fear is based on his personal experiences, including an incident in which a BPD

3

police officer noticed that Pérez was recording police interactions with protesters and proceeded to scream at him and grab his recording device. Pérez also regularly teaches "Know Your Rights" trainings. Pérez would like to instruct trainees that they can secretly record their encounters with police officers when they feel unsafe recording openly, but he does not do so for fear of prosecution under Section 99.

The plaintiffs allege that BPD's official training materials instruct officers that they have a "right of arrest" whenever a person secretly records oral communications. The training materials describe two Massachusetts cases in which the defendants were convicted for secretly recording the police performing their duties in public. A 2010 BPD training video instructed police officers that they could arrest persons who secretly record police officers performing their duties in public.

The plaintiffs also allege that the Suffolk County District Attorney has previously brought Section 99 prosecutions against secret recording of police officers performing their duties in public. For example, in 2006, the Suffolk County District Attorney obtained a conviction involving a defendant who recorded police officers through a device in his jacket during a demonstration. Commonwealth v. Manzelli, 864 N.E.2d 566 (Mass. App. Ct. 2007).

**LEGAL FRAMEWORK**

## I.   **Motion to Dismiss Standard**

A Rule 12(b)(6) motion is used to dismiss complaints that do not "state a claim upon which relief can be granted." See Fed. R. Civ. P. 12(b)(6). In evaluating a Rule 12(b)(6) motion, the Court must accept the factual allegations in the plaintiffs' complaint as true, construe reasonable inferences in their favor, and "determine whether the factual allegations in the plaintiff's complaint set forth a plausible claim upon which relief may be granted." Foley v. Wells Fargo Bank, N.A., 772 F.3d 63, 71 (1st Cir. 2014).

## II.  **Massachusetts Wiretap Statute**

The Massachusetts Wiretap Statute makes it a crime to "willfully commit[] an interception, attempt[] to commit an interception, or procure[] any other person to commit an interception or to attempt to commit an interception of any wire or oral communication." Mass. Gen. Laws ch. 272, § 99(C)(1). Interception is defined as "to secretly hear, secretly record, or aid another to secretly hear or secretly record the contents of any wire or oral communication through the use of any intercepting device by any person other than a person given prior authority by all parties to such communication." Id. § 99(B)(4). An oral communication is defined as "speech, except

5

such speech as is transmitted over the public air waves by radio

or other similar device." Id. § 99(B)(2).

The Massachusetts Supreme Judicial Court has held that the

statute "strictly prohibits the secret electronic recording by a

private individual of any oral communication, and makes no

exception for a motorist who, having been stopped by police

officers, surreptitiously tape records the encounter."

Commonwealth v. Hyde, 750 N.E.2d 963, 964 (Mass. 2001). The SJC

noted that the statute provides a number of exceptions but that

the list does not include any "exception for a private

individual who secretly records the oral communications of

public officials." Id. at 966. The SJC also pointed out that an

earlier version of the law had permitted recording with one-

party consent but that the legislature rejected that approach in

amending the statute in 1968. Id. at 967.

## DISCUSSION

## I.   Standing for Pre-Enforcement Review

Evans and Conley both argue that the plaintiffs lack

standing to bring this suit. The plaintiffs' allegations are

sufficient to survive the defendants' standing challenge at this

stage.

"The party invoking federal jurisdiction has the burden of

establishing standing." Susan B. Anthony List v. Driehaus, 134

S. Ct. 2334, 2342 (2014) (quoting Clapper v. Amnesty Int'l USA,

6

133 S. Ct. 1138, 1148 (2013)). "To establish Article III
standing, a plaintiff must show (1) an 'injury in fact,' (2) a
sufficient 'causal connection between the injury and the conduct
complained of,' and (3) a 'likel[ihood]' that the injury 'will
be redressed by a favorable decision.'" Id. at 2341 (quoting
Lujan v. Defs. of Wildlife, 504 U.S. 555, 560–61 (1992)).

Under certain circumstances, a plaintiff can suffer
sufficient injury to challenge a law without having been subject
to "an actual arrest, prosecution, or other enforcement action"
under that law. Id. at 2342. The First Circuit has recognized
two such types of circumstances. Blum v. Holder, 744 F.3d 790,
796 (1st Cir. 2014) (citing Mangual v. Rotger-Sabat, 317 F.3d
45, 56–57 (1st Cir. 2003)). The first is where a plaintiff
alleges "an intention to engage in a course of conduct arguably
affected with a constitutional interest, but proscribed by the
statute, and there exists a credible threat of prosecution." Id.
at 796 (quoting Babbitt v. United Farm Workers Nat'l Union, 442
U.S. 289, 298 (1979)); see also Susan B. Anthony List, 134 S.
Ct. at 2342. The second is where the plaintiff "is chilled from
exercising her right to free expression or forgoes expression in
order to avoid enforcement consequences." Blum, 744 F.3d at 796
(quoting Mangual, 317 F.3d at 57).

The Supreme Court's most recent discussion of pre-
enforcement standing was Susan B. Anthony List, where the Court

7

held that a political advocacy organization had standing to bring a pre-enforcement challenge to an Ohio statute criminalizing false statements about candidates during political campaigns. 134 S. Ct. at 2347. The plaintiffs "pleaded specific statements they intend to make" in the future, including language about a particular candidate that it intended to display on a billboard. Id. at 2343. Those statements were "arguably proscribed" by the state statute given the statute's broad sweep and a past finding by the Ohio Election Commission that there was probable cause that similar language by the plaintiff violated the statute. Id. at 2344. The plaintiffs also demonstrated a history of "past enforcement against the same conduct," including a prior complaint against the plaintiff itself for similar statements. Id. at 2335. Additionally, the Court noted that complaints under the statute "are not a rare occurrence" and that there are twenty to eighty complaints under the statute per year. Id.

In reaching its decision, the Court in Susan B. Anthony List reviewed a number of past decisions by the Court over the last three decades that support pre-enforcement standing where a First Amendment issue is at stake. In Steffel v. Thompson, the Court held that a Vietnam War protester had standing to seek a declaratory judgment that a criminal trespass statute did not apply to him. 415 U.S. 452 (1974). The Court found a credible

threat of enforcement because the plaintiff had previously been threatened with prosecution if he did not stop handbilling and because the plaintiff's handbilling companion was arrested and charged for the same conduct. Id. at 459.

In Babbitt v. United Farm Workers National Union, the Court held that a farmworkers' union had standing to bring a pre-enforcement challenge to an Arizona statute criminalizing "dishonest, untruthful, and deceptive publicity" relating to any agricultural product. 442 U.S. 289 (1979). The Court found it sufficient that the union "actively engaged in consumer publicity campaigns in the past in Arizona," that it alleged "an intention to continue to engage in boycott activities in that State," and that erroneous statements are inevitable in any publicity campaign. Id. at 301. While the defendants argued that "the criminal penalty provision has not yet been applied and may never be applied to commissions of unfair labor practices, including forbidden consumer publicity," it was sufficient to create a credible threat of prosecution that "the State has not disavowed any intention of invoking the criminal penalty provision against unions that commit unfair labor practices." Id. at 302.

In Virginia v. American Booksellers Association, Inc., the Court held that a booksellers' organization had standing to bring a pre-enforcement challenge to a Virginia statute making

it a crime to knowingly display sexually explicit material
accessible to juveniles. 484 U.S. 383 (1988). The plaintiffs
listed sixteen books that they believed were covered by the
statute and testified that the law might cover as much as half
of their inventory. Id. at 390-91. The Court stated: "We are not
troubled by the pre-enforcement nature of this suit. The State
has not suggested that the newly enacted law will not be
enforced, and we see no reason to assume otherwise. We conclude
that plaintiffs have alleged an actual and well-founded fear
that the law will be enforced against them. Further, the alleged
danger of this statute is, in large measure, one of self-
censorship; a harm that can be realized even without an actual
prosecution." Id. at 393.

Finally, in Holder v. Humanitarian Law Project, the Court
held that the plaintiffs had standing to bring a pre-enforcement
challenge to a federal law that criminalized "knowingly
provid[ing] material support or resources to a foreign terrorist
organization." 561 U.S. 1, 8 (2010). The plaintiffs claimed
"that they provided support to [two foreign terrorist
organizations] before the enactment of [the law in question] and
that they would provide similar support again if the statute's
allegedly unconstitutional bar were lifted." Id. at 15-16.
Moreover, the government had charged about 150 persons with
violation of the law and "several of those prosecutions involved

the enforcement of the statutory terms at issue here." Id. at
16. Finally, "[t]he Government has not argued to this Court that
plaintiffs will not be prosecuted if they do what they say they
wish to do." Id.

Drawing on the above cases, the Court easily concludes that
the complaint sufficiently alleges an intention to engage in a
particular course of conduct if not for Section 99. While Susan
B. Anthony List involved specific language that the plaintiffs
would have put on a billboard, the Court in earlier cases found
pre-enforcement standing without demanding that level of
specificity from plaintiffs. The plaintiffs in this case allege
that if not for Section 99, they would secretly record police
officers when they feel that open recording would put them in
danger. The plaintiffs argue that they cannot provide any more
specific details of whom they intend to record, where, when and
how frequently because encounters with the police are not
predictable events. The plaintiffs' allegations of their
intended conduct are sufficiently specific.

The cases also suggest that the Court can assume that the
plaintiffs will face a credible threat of prosecution should
they engage in their intended actions. The First Circuit has
stated that "when dealing with pre-enforcement challenges to
recently enacted (or, at least, non-moribund) statutes that
facially restrict expressive activity by the class to which the

11

plaintiff belongs, courts will assume a credible threat of
prosecution in the absence of compelling contrary evidence."
N.H. Right to Life Political Action Comm. v. Gardner, 99 F.3d 8,
15 (1st Cir. 1996); see also Hedges v. Obama, 724 F.3d 170, 197
(2d Cir. 2013). Such an assumption remains good law. See Blum,
744 F.3d at 798 n.11 (holding prior to Susan B. Anthony List).

Section 99 is alive and well. Although there are no
statistics in the record about how often persons are arrested or
charged for a Section 99 violation, the complaint alleges recent
instances of Section 99 prosecutions in the state. The SJC has
held that Section 99 applies in a situation analogous to that of
the plaintiffs. See Hyde, 750 N.E.2d at 964. Not hiding the
ball, both defendants stated at oral argument that they do not
disavow enforcement of Section 99 against persons like the
plaintiffs. See Blum, 744 F.3d at 799 (finding no standing where
"the Government . . . disavowed any intention to prosecute
plaintiffs for their stated intended conduct"). As such, the
Court finds a credible threat of enforcement against the
plaintiffs.

The defendants rely heavily on Clapper v. Amnesty
International USA to argue otherwise. 133 S. Ct. 1138 (2013). In
Clapper, the Court found that human rights organizations did not
have standing to challenge a federal statute authorizing
surveillance of foreign individuals with whom the organizations

12

might communicate. Id. at 1155. The Court held that the claimed injury (the possibility of surveillance of the plaintiff organizations) could only be the result of a "highly attenuated chain of possibilities." Id. at 1148. The Court also held in Clapper that plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." Id. at 1151. The plaintiffs' injury causation chain in this case is not as attenuated as the chain in Clapper since the injury here does not depend on the government enforcing a law against another person with whom the plaintiffs might potentially interact.

Finally, the defendants argue that the plaintiffs cannot meet the redressability prong of the standing analysis because even if the BPD does not enforce Section 99 against the plaintiffs, there are other law enforcement authorities outside its control that may, such as the transit police. But the redressability requirement is not so burdensome. See Massachusetts v. E.P.A., 549 U.S. 497, 525 (2007) (citing Larson v. Valente, 456 U.S. 228, 244 n.15 (1982) ("[A] plaintiff satisfies the redressability requirement when he shows that a favorable decision will relieve a discrete injury to himself. He need not show that a favorable decision will relieve his every injury.")).

13

The Court concludes that the plaintiffs have sufficiently alleged standing.

## II.  **Municipal Liability**

BPD Commissioner Evans argues that the complaint does not adequately plead Monell liability because the city is enforcing a statute passed by the state legislature, not adopting its own policy. He argues that a city cannot be liable for simply enforcing state law. This legal issue has not yet been fully addressed by the First Circuit.

Local governments (and local officials sued in their official capacities) can be sued under § 1983 "for monetary, declaratory, or injunctive relief where . . . the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." Monell v. Dep't of Soc. Servs. of City of N.Y., 436 U.S. 658, 690 (1978).[2] "[T]he word 'policy' generally implies a course of action consciously chosen from among various alternatives." Okla. City v. Tuttle,

---

[2]     Evans is sued in his official capacity as Commissioner of the BPD so the suit is treated as one against the City of Boston. "[O]fficial-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent." Monell, 436 U.S. at 690 n.55 (1978); see also Kentucky v. Graham, 473 U.S. 159, 166 (1985) ("[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity."); Will v. Michigan Dep't of State Police, 491 U.S. 58, 71 (1989).

471 U.S. 808, 823 (1985). A suit for prospective injunctive relief against the City of Boston is subject to Monell. "Monell's 'policy or custom' requirement applies in § 1983 cases irrespective of whether the relief sought is monetary or prospective." Los Angeles Cty. v. Humphries, 562 U.S. 29, 39 (2010). The Court's reasoning in Humphries was that nothing in the language or logic of Monell or § 1983 distinguished between different kinds of relief. Id. at 36–37.

Evans argues that the BPD cannot be liable for enforcing state law because a municipality's enforcement of state law is not a city policy or custom within the meaning of Monell.[3] Evans relies primarily on the Seventh Circuit's decision in Surplus Store & Exchange, Inc. v. City of Delphi, which stated: "It is difficult to imagine a municipal policy more innocuous and constitutionally permissible, and whose causal connection to the alleged violation is more attenuated, than the 'policy' of enforcing state law. If the language and standards from Monell are not to become a dead letter, such a 'policy' simply cannot be sufficient to ground liability against a municipality." 928 F.2d 788, 791–92 (7th Cir. 1991); see also Bethesda Lutheran Homes & Servs., Inc. v. Leean, 154 F.3d 716, 718 (7th Cir. 1998) (stating that "the position of this circuit" is that a county

---

[3]    The plaintiffs expressly disclaim a "failure to train" claim against Evans. Docket No. 31 at 15 n.4.

"cannot be held liable under section 1983 for acts that it did under the command of state or federal law").

The First Circuit has not weighed in on this question, aside from brief dicta in a concurrence, <u>Yeo v. Town of Lexington</u>, 131 F.3d 241, 257 (1st Cir. 1997) (Stahl, J., concurring), that positively cited <u>Surplus Store</u>. But the Second Circuit later wrote: "[W]e agree with all circuits to address state laws <u>mandating</u> enforcement by municipal police officers that a municipality's decision to honor this obligation is not a conscious choice. As a result, the municipality cannot be liable under <u>Monell</u> in this circumstance. On the other hand, if a municipality decides to enforce a statute that it is <u>authorized, but not required</u>, to enforce, it may have created a municipal policy. However, we do not believe that a mere municipal directive to enforce all state and municipal laws constitutes a city policy to enforce a particular unconstitutional statute. . . . [I]t is necessary, at a minimum, that a municipal policymaker have focused on the particular statute in question. We, therefore, hold that there must have been conscious decision making by the City's policymakers before the City can be held to have made a conscious choice." <u>Vives v. City of N.Y.</u>, 524 F.3d 346, 353 (2d Cir. 2008) (emphases added). The Second Circuit remanded to the district court for determination of "(1) whether the City had a meaningful choice as to whether it would enforce

16

[the statute in question]; and (2) if so, whether the City adopted a discrete policy to enforce [the statute in question] that represented a conscious choice by a municipal policymaker." Id.

Applying the framework articulated by the Second Circuit, the complaint sufficiently alleges a conscious decision by the BPD to enforce Section 99. The complaint alleges: "BPD's official training materials instruct officers that they may arrest and seek charges against private individuals who secretly record police officers performing their duties in public." Docket No. 1 at 15. The complaint also alleges that a BPD Academy Training Bulletin "instructs police officers that they have a 'right of arrest' whenever a person" secretly records oral communications. Id. Finally, the complaint alleges that a 2010 BPD training video "instruct[ed] police officers that they could arrest private individuals who secretly recorded police officers performing their duties in public." Id. at 16. These factual allegations suggest that the BPD has affirmatively and consciously chosen to educate officers about Section 99 and its particular application to the recording of officers' activities. The plaintiffs adequately plead a Monell claim against BPD Commissioner Evans.

17

III. **Pullman Abstention**

Suffolk County D.A. Conley argues that the Court should abstain under Pullman because of uncertainty about the meaning of Section 99. Alternatively, Conley argues that those questions should be certified to Massachusetts courts. This argument is meritless.

"Under Pullman, federal courts should abstain when state law is uncertain, and a clarification of the law in a pending state court case might make the federal court's constitutional ruling unnecessary." Rivera-Puig v. Garcia-Rosario, 983 F.2d 311, 321–22 (1st Cir. 1992) (citing R.R. Comm'n of Tex. v. Pullman Co., 312 U.S. 496, 501 (1941)). "To warrant Pullman abstention: (1) there must be substantial uncertainty over the meaning of the state law at issue; and (2) there must be a reasonable possibility that the state court's clarification of the law will obviate the need for a federal constitutional ruling." Id. (citing Haw. Hous. Auth. v. Midkiff, 467 U.S. 229, 236–37 (1983)).

The latter requirement is not met here. Conley argues that abstention is appropriate to allow a state court to answer two interpretive questions raised by the development of new technology: (1) In what situations a subject can be presumed to have knowledge that he or she is being recorded, making a recording not secret -- and whether a person visibly holding a

18

cell phone is enough; and (2) Whether smartphones are exempted from the definition of "intercepting devices" under the "telephone exception," to Section 99.[4] Conley argues that if Massachusetts courts conclude that certain devices are not "intercepting devices" or that knowledge of persons recorded may be presumed in certain circumstances, then a ruling from this Court would be unnecessary since the plaintiffs could not be prosecuted under Section 99.

There is no "reasonable possibility" that resolution of these issues will dispose of the constitutional questions. Section 99 is not obviously susceptible to a limiting construction that excludes the audio recording function on cell phones, and the parties point to no pending cases where a party has asked a court to adopt this limiting construction. Even if a court held that in some circumstances it may be presumed that a person holding a cell phone is recording, the statute would still cover other forms of secret recording. The plaintiffs' challenge here does not pertain solely to secret recording by cell phones, but secret recording of police officers by use of

---

[4]     The "telephone exception" is the exclusion from the definition of "intercepting device" of "any telephone or telegraph instrument, equipment, facility, or a component thereof, (a) furnished to a subscriber or user by a communications common carrier in the ordinary course of its business under its tariff and being used by the subscriber or user in the ordinary course of its business; or (b) being used by a communications common carrier in the ordinary course of its business." Mass. Gen. Laws ch. 272, § 99(B)(3).

any device. <u>Pullman</u> abstention is not appropriate. <u>See</u> <u>Haw.</u>
<u>Hous. Auth.</u>, 467 U.S. at 237 ("[A]bstention is not to be ordered
unless the statute is of an uncertain nature, and is obviously
susceptible of a limiting construction." (quoting <u>Zwickler v.</u>
<u>Koota</u>, 389 U.S. 241, 251 n.14 (1967))).

## IV.   <u>First Amendment Claim</u>

Evans argues that the plaintiffs fail to state a claim
under the First Amendment because the First Amendment does not
provide any right to secretly record police officers. Existing
First Circuit authority holds otherwise.

"[T]he First Amendment goes beyond protection of the press
and the self-expression of individuals to prohibit government
from limiting the stock of information from which members of the
public may draw." <u>Glik v. Cunniffe</u>, 655 F.3d 78, 82 (1st Cir.
2011) (quoting <u>First Nat'l Bank v. Bellotti</u>, 435 U.S. 765, 783
(1978)); <u>see also</u> <u>Va. State Bd. of Pharmacy v. Va. Citizens</u>
<u>Consumer Council, Inc.</u>, 425 U.S. 748, 757 (1976) (recognizing
public right to "receive information and ideas"). To protect the
stock of public information, the First Amendment "encompasses a
range of conduct related to the gathering and dissemination of
information." <u>Glik</u>, 655 F.3d at 82.

Among the protected forms of information gathering is audio
and audiovisual recording. <u>See</u> <u>Am. Civil Liberties Union of Ill.</u>
<u>V. Alvarez</u>, 679 F.3d 583, 595 (7th Cir. 2012) ("The act of

<u>making</u> an audio or audiovisual recording is necessarily included within the First Amendment's guarantee of speech and press rights as a corollary of the right to disseminate the resulting recording. The right to publish or broadcast an audio or audiovisual recording would be insecure, or largely ineffective, if the antecedent act of <u>making</u> the recording is wholly unprotected."). This protection of information-gathering activities inures to the benefit not only of news media but also of members of the public. <u>See</u> <u>Glik</u>, 655 F.3d at 83 (noting that the "public's right of access to information is coextensive with that of the press").

Information-gathering activities serve a particularly important First Amendment interest where the information gathered is "about government officials in a form that can readily be disseminated to others." <u>Id.</u> at 82. "[T]here is practically universal agreement that a major purpose of [the First] Amendment was to protect the free discussion of governmental affairs." <u>Mills v. State of Ala.</u>, 384 U.S. 214, 218 (1966). "Freedom of expression has particular significance with respect to government because it is here that the state has a special incentive to repress opposition and often wields a more effective power of suppression." <u>First Nat. Bank</u>, 435 U.S. at 777 n.11. As such, the First Circuit has expressly recognized that the First Amendment protects "a citizen's right to film

government officials, including law enforcement officers, in the discharge of their duties in a public space." Glik, 655 F.3d at 85.

Information gathering through audio and audiovisual recording, like all activities protected by the First Amendment, is subject to reasonable restrictions. See id. at 84 (citing Smith v. City of Cumming, 212 F.3d 1332, 1333 (11th Cir. 2000)); see also Gericke v. Begin, 753 F.3d 1, 7-8 (1st Cir. 2014); Alvarez, 679 F.3d at 607. The question here is whether the restriction on secret recording is reasonable. The level of scrutiny applied to the restriction turns on whether the restriction is content-based or content-neutral. See Rideout v. Gardner, 838 F.3d 65, 71 (1st Cir. 2016). Section 99 is content-neutral because it singles out communications that are secretly intercepted, without reference to the content of the intercepted communications. See Jean v. Mass. State Police, 492 F.3d 24, 29 (1st Cir. 2007).

"Content-neutral restrictions are subject to intermediate scrutiny, which demands that the law be 'narrowly tailored to serve a significant governmental interest.'" Rideout, 838 F.3d at 71-72 (quoting Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989)). To survive intermediate scrutiny, a content-neutral restriction "need not be the least restrictive or least

intrusive means of serving the government's interests." <u>Id.</u> at 72 (quoting <u>McCullen v. Coakley</u>, 134 S. Ct. 2518, 2535 (2014)).

Section 99 fails intermediate scrutiny as applied to the secret recording of government officials, including law enforcement officers, in the discharge of their duties in a public space. The government does not have a significant interest in protecting the privacy of law enforcement officials discharging their duties in a public place. <u>See</u> <u>Glik</u>, 655 F.3d at 84 ("In our society, police officers are expected to endure significant burdens caused by citizens' exercise of their First Amendment rights.").

The government raises a fair concern about secret recording and broadcasting of conversations between a crime victim and law enforcement. The government also has a significant interest in restricting First Amendment activities that interfere with the performance of law enforcement activities or present legitimate safety concerns. Those significant interests may justify certain restrictions on audio and audiovisual recording of government officials' activities. <u>See</u> <u>Gericke</u>, 753 F.3d at 8 ("The circumstances of some traffic stops, particularly when the detained individual is armed, might justify a safety measure -- for example, a command that bystanders disperse -- that would incidentally impact an individual's exercise of the First Amendment right to film."); <u>see also</u> <u>Alvarez</u>, 679 F.3d at 607

("It goes without saying that the police may take all reasonable steps to maintain safety and control, secure crime scenes and accident sites, and protect the integrity and confidentiality of investigations. While an officer surely cannot issue a 'move on' order to a person because he is recording, the police may order bystanders to disperse for reasons related to public safety and order and other legitimate law-enforcement needs."); Glik, 655 F.3d at 84 ("To be sure, the right to film is not without limitations. It may be subject to reasonable time, place, and manner restrictions. We have no occasion to explore those limitations here, however.").

But Section 99 is not narrowly tailored to serve those government interests. Section 99 restricts a significant amount of nondisruptive and safe First Amendment activities such as a "peaceful recording of an arrest in a public space that does not interfere with the police officers' performance of their duties." Glik, 655 F.3d at 84. The plaintiffs have adequately stated a claim that Section 99, as applied to the secret recording of government officials in the performance of their duties in public, violates the First Amendment.

## ORDER

Conley's motion to dismiss (Docket No. 16) and Evans'

motion to dismiss (Docket No. 18) are **DENIED**.

/s/PATTI B. SARIS_____
Patti B. Saris
Chief United States District Judge