1                 IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF MASSACHUSETTS

2

3  K ERIC MARTIN, et al,          )
                            )

4             Plaintiffs     )
                            )

5        -VS-             )  CA No. 16-11362-PBS
                            )  Pages 1 - 37

6  WILLIAM B. EVANS in his Official  )
  Capacity as Police Commissioner    )

7  for the City of Boston, et al,    )
                            )

8             Defendants     )

9

10                     **MOTION HEARING**

11           BEFORE THE HONORABLE PATTI B. SARIS
           UNITED STATES CHIEF DISTRICT JUDGE

12

13

14

15

16                         United States District Court
                         1 Courthouse Way, Courtroom 19

17                         Boston, Massachusetts  02210
                         February 6, 2017, 2:42 p.m.

18

19

20

21

22

23                    LEE A. MARZILLI
                OFFICIAL COURT REPORTER
           United States District Court

24           1 Courthouse Way, Room 7200
              Boston, MA  02210

25               (617)345-6787

1    A P P E A R A N C E S:

2        JESSIE J. ROSSMAN, ESQ. and MATTHEW SEGAL, ESQ.,
     American Civil Liberties Union of Massachusetts,
3    211 Congress Street, 3rd Floor, Boston, Massachusetts,
     02110, for the Plaintiffs.

4
         WILLIAM D. DALSEN, ESQ., Proskauer Rose LLP,
5    One International Place, Boston, Massachusetts, 02210-2600,
     for the Plaintiffs.

6
         MATTHEW M. McGARRY, ESQ., Assistant Corporation
7    Counsel, City of Boston Law Department, City Hall, Room 615,
     Boston, Massachusetts, 02201, for the Defendant, William B.
8    Evans.

9        PETER M. GERAGHTY, ESQ., Boston Police Department,
     Office of the Legal Advisor, One Schroeder Plaza, Boston,
10   Massachusetts, 02120, for the Defendant, William B. Evans.

11       RYAN E. FERCH, ESQ., Assistant Attorney General,
     Appeals Division, Office of the Attorney General Criminal
12   Bureau, One Ashburton Place, 19th Floor, Boston,
     Massachusetts, 02108, appearing for the Defendant,
13   Daniel F. Conley.

14

15

16

17

18

19

20

21

22

23

24

25

<u>P R O C E E D I N G S</u>

1

2       THE CLERK:  Court calls Civil Action 16-11362,

3  Martin v. Evans, et al.  Could counsel please identify

4  themselves.

5       MS. ROSSMAN:  Good afternoon, your Honor.  Jessie

6  Rossman on behalf of the plaintiff.

7       THE COURT:  A little bit louder.

8       MS. ROSSMAN:  Sure thing.

9       THE COURT:  Perfect.

10      MS. ROSSMAN:  Good afternoon, your Honor.  Jessie

11 Rossman on behalf of the plaintiffs.  With me at counsel

12 table are Matthew Segal and William Dalsen.

13      THE COURT:  Good, okay.

14      MR. McGARRY:  Good afternoon, your Honor.  Matthew

15 McGarry on behalf of Commissioner Evans, and I'm here with

16 Peter Geraghty, who's also representing the Commissioner in

17 this case.

18      MR. FERCH:  Good afternoon, your Honor.  Ryan

19 Ferch on behalf of DA Conley.

20      THE COURT:  Are you going to be wanting to argue

21 separately?

22      MR. FERCH:  We haven't discussed that, but I

23 believe so.  I'm happy to take questions in whatever order

24 is most helpful to you.

25      THE COURT:  All right, thank you.

1          THE CLERK:  You can be seated.

2          THE COURT:  All right, so the moving party.

3          MR. McGARRY:  Good afternoon, your Honor.  Matthew

4    McGarry on behalf of Commissioner Evans.  If I may just

5    summarize the Commissioner's position for the Court, the

6    allegation --

7          THE COURT:  Can I start with -- this would make the

8    whole case maybe go away -- do you disavow that you're going to

9    arrest anyone for this statute?

10          MR. McGARRY:  No, your Honor.  Commissioner Evans

11    doesn't disavow that the statute is being enforced by the

12    Boston Police Department, but it's the Commissioner's position

13    that that would not --

14          THE COURT:  I was just going to say, when I read these

15    cases, they all say, if the state or the city or the prosecutor

16    says "Dead letter, not doing anything with it, gone" -- you

17    know, the way the old, you know, Puritan statutes, you know,

18    you can't have a pigpen -- if you're not going to enforce it,

19    then there's no case.  But you are going to enforce it, is that

20    right?

21          MR. McGARRY:  That's right, your Honor.  Unfortunately,

22    for the sake of judicial economy, it's the Commissioner's

23    position that we are not disavowing any enforcement of the

24    statute at this time.

25          THE COURT:  All right.  So how about District

1    Attorney -- you could walk out the door right now -- are you

2    going to be prosecuting people for this?

3              MR. FERCH:  As tempting as that is, your Honor, I

4    can't do that and for a number of reasons.  One, the statute

5    doesn't as --

6              THE COURT:  All right, I don't -- we're here.

7              MR. FERCH:  Okay.

8              THE COURT:  All right, we're here.

9              MR. McGARRY:  Your Honor, the allegations in this

10   case, plaintiffs are political activists who allege no injury

11   apart from a generalized grievance with a state statute; and

12   because they're generalized grievances with a state statute and

13   not with any specific policy or procedure of Commissioner Evans,

14   the complaint against Commissioner Evans suffers from a series

15   of fatal defects.  First and foremost is a critical deficiency

16   with the standing, the standing issue.  Standing is not

17   sufficiently alleged in the plaintiffs' complaint.  There's no,

18   first of all, injury in fact alleged.  Plaintiffs do not allege

19   that they have been arrested by the Boston Police.

20             THE COURT:  This is one of these pre-enforcement cases

21   like *Susan B. Anthony*, right?

22             MR. McGARRY:  That's right, your Honor.  It's not

23   necessarily required, but it's certainly not alleged here that

24   plaintiffs were arrested because --

25             THE COURT:  But you just said -- I mean, maybe it was

1    a trick question -- but you're going to enforce it, so why

2    aren't they realistically worried?

3            MR. McGARRY:  So this is more of a deficiency with the

4    plaintiffs' pleas because there is no allegation not only that

5    the plaintiffs were not arrested or that there was any

6    prosecution, but there's no allegations that Boston Police have

7    arrested other people pursuant to the statute.

8            To answer your Honor's point as to why that matters

9    here, these allegations are not concrete or particularized, and

10   they're not actual or imminent in such a way that would meet

11   the "certainly impending" standard imposed by *Clapper*.

12           More importantly, I think, are the issues here of

13   causation and redressability.  As I said earlier, plaintiffs

14   take issue with the state statute.  This is something that was

15   not caused by Commissioner Evans.  It was caused by the

16   state --

17           THE COURT:  Yes, and I thought that was a really

18   interesting -- that was actually a more interesting issue than

19   the standing issue, or the likeness issue, the Article 3 issue.

20   So how do I -- what is the right remedy?  If I think there's

21   standing and that it's ripe but you're enforcing a state law,

22   not his own policy --

23           MR. McGARRY:  That's right.

24           THE COURT:  -- who is the correct defendant here?

25           MR. McGARRY:  Your Honor, it's not for me to say who

1    the plaintiff should --

2         THE COURT:  Well, it's got to be someone, right, if

3    there's a First Amendment violation?  And you're saying it

4    isn't Commissioner Evans, which it may not be because there's a

5    split between the Seventh Circuit and the Second Circuit,

6    right, on whether or not just enforcing a state policy is

7    enough to make it custom and policy of the municipality?  It's

8    a really interesting question.

9         MR. McGARRY:  I think so too, your Honor, and I think

10   the answer to your question would be that it would be a suit

11   directly against the Commonwealth and not necessarily against

12   District Attorney Conley, and certainly not against

13   Commissioner Evans.

14        THE COURT:  I thought I wasn't allowed to enjoin the

15   Commonwealth.  Do I arrest Governor Baker if he doesn't comply?

16   I mean, most of the suits like this were against the city as

17   opposed to the police commissioner.  They were against the city

18   saying -- would that be the correct defendant?

19        MR. McGARRY:  No, your Honor, and in fact this suit

20   against Commissioner Evans is in his official capacity, and

21   under *Monell*, that is in effect a suit against the City of

22   Boston.  However, as to the point on causation and

23   redressability, your Honor mentions the issue of what would be

24   the correct remedy.  Redressability is also a standing issue

25   here.  As against Commissioner Evans, if the Court were to

1    impose some restriction on the Commissioner enforcing the

2    statute, it would not alleviate plaintiffs' concerns with the

3    threat of arrest.  In plaintiffs' opposition, they point to the

4    fact that or the alleged fact that Commissioner Evans and

5    DA Conley are the law enforcement authorities in Boston, but

6    there are a number of other law enforcement authorities,

7    including the T Police which are referenced in one of the cases

8    cited by plaintiffs.  So if the Court was to enjoin

9    Commissioner Evans in this case, plaintiffs would not have

10   redress here because the first time they walked into a T

11   station or crossed town lines, they would be subject to arrest

12   again.  And this all stems from the critical issue here, which

13   is that plaintiffs' complaint is in essence against the state

14   statute and not against any policy or procedure of

15   Commissioner Evans.

16         THE COURT:  So you're saying, if I declare that as

17   written it violates the First Amendment, it has to be through

18   basically a declaration rather than an injunction?

19         MR. McGARRY:  My position is that the Commissioner is

20   simply not the proper party here.

21         THE COURT:  Well, you've got to help me a little bit

22   more.  So who is?

23         MR. McGARRY:  The Commonwealth of Massachusetts, your

24   Honor.

25         THE COURT:  So you think I can sue the Commonwealth of

1    Massachusetts -- not me, but I can enjoin the Commonwealth of

2    Massachusetts?  From doing what?  They can't stop

3    Commissioner Evans, right?

4            MR. McGARRY:  The Court could issue a declaratory

5    judgment that the state statute was invalid as applied to --

6            THE COURT:  Yes, so you're saying I just need to go

7    through a declaration rather than a --

8            MR. McGARRY:  Yes.

9            THE COURT:  Well, let me ask this:  On the *Monell*

10   issue, given the fact that at least your training manual

11   teaches police that it's discretionary as to whether or not to

12   arrest --

13           MR. McGARRY:  Well, there are two issues with that,

14   your Honor.  The first issue with that is that nobody takes

15   issue with the fact that that's a proper interpretation of the

16   state statute.  I would argue that that's not in effect a

17   policy or procedure of the City, simply providing officers with

18   a document describing that they can or cannot arrest somebody

19   under a state law as properly understood.

20           The second issue with that is that if the alleged

21   policy here was to be deficient training, then there's a higher

22   standard there, and that higher standard is a recklessness

23   standard, reckless disregard of the rights of others, and

24   that's plainly not what's being alleged here.  In fact, the

25   plaintiffs expressly disclaim that they're alleging a

1    constitutional deficiency with the training of Boston police

2    officers.

3         THE COURT:  Well, I think the training is correct.  I

4    mean, it's just if the statute is unconstitutional, it's just

5    unconstitutional.

6         MR. McGARRY:  And that's essentially the Commissioner's

7    position here, your Honor, is that the crux of this complaint

8    is against the state statute and not against Commissioner Evans

9    at all.  So regardless of what's contained in those training

10   materials, Commissioner Evans is not the appropriate party

11   here.

12        Moving on to the First Amendment issue, your Honor,

13   it's the Commissioner's position that the First Amendment

14   simply doesn't extend as far as plaintiffs would have it.

15   *Glik*, the *Glik* case involved open recording, not secret

16   recording.  It relied on the First Circuit's holding in

17   *Yacobucci*, which qualified that right by saying that the

18   recording at issue in that case was not in derogation of any

19   law.  But here we do have a law, and that law is Section 99

20   which forbids secret recording.

21        Furthermore, in the *Glik* case, in assessing the

22   lawfulness of the arrest, the First Circuit didn't strike down

23   Section 99 under which the plaintiff was prosecuted.  Rather,

24   it noted that plaintiff's recording was open and not in

25   violation of the statute in that case.  It also made reference

1    to a Third Circuit case which it distinguished on the grounds

2    that the right to film was something completely different from

3    a traffic stop situation.  "Worlds apart" was I believe the

4    phrase that the court used.

5        THE COURT:  One of the concerns I have in your reading

6    of *Glik* is, there were two parts of *Glik*.  There was the First

7    Amendment part and the Fourth Amendment part, and it was

8    whether or not there was qualified immunity on the Fourth; and

9    then the court went through what you're talking about now, but

10   on the First Amendment, it wasn't so qualified.

11       MR. McGARRY:  Your Honor, it's true that those are two

12   separate sections of the decision, but I think that the fact

13   that it was qualified in the second part of the decision is an

14   important limitation on the scope of the first part of the case

15   and on the scope of the --

16       THE COURT:  What's the language in the first part of

17   the case you're looking at to say that it's only limited to

18   secret versus not secret?

19       MR. McGARRY:  The specific language is in the second

20   part of the case.

21       THE COURT:  Yes, yes.  So that was because it was

22   unclear whether the police officer should have been on the hook

23   for it.

24       MR. McGARRY:  But the court in that case could simply

25   have noted that Section 99 was unconstitutional as applied to

1    the police officers.  Now, that would be going a little bit

2    beyond, but it didn't note that at all.  Rather, it

3    distinguished the facts of that case from a situation where

4    Section 99 would apply, and it was very clear about that.  Now,

5    regardless of the fact that it was in another section of the

6    case and part of a separate analysis, I think that that's an

7    important limitation nonetheless.

8         THE COURT:  Let me say, if I found there was standing

9    and I'm not going to abstain and I think there are parts of the

10   statute as applied have First Amendment concerns, how would you

11   draw the limitation, with just the police officers?  Would you

12   make it public officials more broadly?

13        MR. McGARRY:  I would draw the limitation exactly as

14   it's explained in *Glik*, your Honor, which would be to police

15   officers.

16        THE COURT:  So you'd limit it to the police officers?

17        MR. McGARRY:  Yes.

18        THE COURT:  And how could I do a principled line

19   drawing between police officers, say, and firefighters or

20   teachers, say, judges?  How would you decide which public

21   employees make sense within the scope of their duties in a

22   public place?

23        MR. McGARRY:  Well, your Honor, I think that that's a

24   serious area of concern, and that's part and parcel of the

25   reason why I would suggest to limit the scope of *Glik* to its

1   facts because there are questions about what and who else is

2   being recorded and whether that's appropriate in addition to

3   openly recording police officers in public.

4           THE COURT:  I thought that was an excellent point in

5   your brief, whether or not I limit it just to police officers

6   or to people talking to police officers.

7           MR. McGARRY:  Thank you, your Honor, and that's the

8   concern exactly that I was talking about.  Section 99 requires

9   a sort of consent, and the argument from plaintiffs is that

10  police officers have special considerations here.  Now, even if

11  the Court takes that as true, it doesn't necessarily extend to

12  people that the police are interacting with, including crime

13  victims.  Or there was an example where plaintiffs said they

14  wanted to record Boston Police interactions with homeless

15  people, but there was no allegation as to how or if consent

16  would be obtained from those other people who were being

17  recorded.

18          It's sort of packed into the general concern that we

19  have here with this complaint, in that the Court is being asked

20  to draw too many assumptions, and I think that rests

21  fundamentally on the fact that there is no case or controversy

22  here.

23          THE COURT:  All right, thank you.

24          MR. McGARRY:  Thank you, your Honor.

25          MR. FERCH:  Good afternoon, your Honor.  Nobody doubts

1    that police and public interactions are important, but what

2    we've asked for in our motion to dismiss is the Court recognize

3    that there isn't standing on this amorphous complaint, and,

4    two, recognize the power of state courts to interpret state

5    law.  And as to --

6              THE COURT:  Yes, but this is federal.  This is the

7    First Amendment.

8              MR. FERCH:  The First Amendment is, but as we point

9    out, there are numerous issues of state law that if clarified

10   could obviate these two plaintiffs' need to get to the First

11   Amendment.

12             Now, I want to start quickly with the disavowal point.

13   We are not required --

14             THE COURT:  I know I popped that on you.

15             MR. FERCH:  What's that?

16             THE COURT:  I popped -- have you ever prosecuted, you,

17   the District Attorney, prosecuted someone for tape recording a

18   police officer?

19             MR. FERCH:  Well, and that's exactly the point that I

20   want to get to is, one time approximately ten years ago is all

21   that's alleged against DA Conley, and the reason, what I'm

22   getting to --

23             THE COURT:  So why isn't he willing to disavow it?

24             MR. FERCH:  Well, we can't disavow it because, as we

25   talked about in the *Project Veritas* case, this statute extends

1   to numerous other contexts beyond just police public

2   interactions, so we can't disavow it.  And the other part of

3   the problem is --

4            THE COURT:  What if I limited it to police, would you

5   disavow it?

6            MR. FERCH:  There's too many problems with the

7   complaint.  You know, the plaintiffs allege that they intend to

8   record --

9            THE COURT:  You're hedging.

10           MR. FERCH:  Well, I can't because of the nature of the

11  complaint.  We don't know -- again, keep in mind, to be a

12  prosecutable offense, it has to be intentional, secret, and

13  audio.  We don't know from the complaint what they intend to

14  use.  Are we talking about a cell phone in a pocket?  Are we

15  talking about a wire?  Are we talking about a body camera?

16  What are we talking about?

17           Two, they don't describe -- you know, one of the big

18  issues here, and it's been alluded to before, is, what are

19  public duties?  What are the police's duties?  Are they talking

20  to victims?  Are they talking to children?  Are they talking to

21  confidential informants?  Are they executing a warrant?  Could

22  the plaintiffs secrete a wire on their body and follow the

23  police as they execute a warrant?  Could they sit at home

24  listening to the police scanner and then run to wherever that

25  place is?  I mean, what are the public duties of police

1      officers and who are they recording?

2           The problem with the plaintiffs' pleadings is, they're

3      amorphus.  They shift constantly.  They say, "Well, we want to

4      record our interactions with the police, but we also want to

5      record police interactions with black and Hispanic and homeless

6      people."  As counsel pointed out, we don't know, is there

7      consent there?  How?  When?  Using what devices?  There's just

8      too many problems for this complaint to go forward.  It's just

9      not a clean issue of First Amendment law.

10          THE COURT:  Yes, but the only way you're going to get

11     something crystal clear is to have someone arrested first like

12     in *Glik,* but then that puts somebody in an untenable position.

13     You are allowed pre-enforcement cases.

14          MR. FERCH:  You are allowed pre-enforcement cases,

15     but, again, it has to be certainly impending, and there has to

16     be some specificity.  And the point -- I know I keep circling

17     on it under this disavowal -- in *Bloom* -- and I recognize

18     there's some tension here -- in *Bloom,* the First Circuit said,

19     "In assessing the risk of prosecution as to particular facts,

20     weight must be given to the lack of a history of enforcement of

21     the challenged statute to like facts, that no enforcement has

22     been threatened as to plaintiff's proposed activity."  Then

23     they go on and say particular weight should be given if the

24     government disavows it, but that's a requirement.

25          THE COURT:  No, but it ends it.

1          MR. FERCH:  It does -- well, it can end it.  But,

2    again, it gets back to my point about one case, and what we

3    have here is, we have one case that was prosecuted ten years

4    ago pre-*Glik* and plaintiffs' amorphus pleadings, and it's just

5    not enough to know or to be able to craft what -- and, again,

6    they call it an as-applied challenge, but, you know, to what?

7    These two plaintiffs -- and, again, one of the other points is,

8    even if these two plaintiffs are upstanding members and they

9    say, "We're going to do this," which we have no reason to doubt

10   that, who's to say that there aren't other people out there, if

11   you create this right that hasn't been recognized before, that

12   won't take advantage of the issue and of the complexity?

13          I'm happy to address the *Pullman* abstention issue too.

14          THE COURT:  I'm not going to abstain, so you've

15   reserved it.

16          MR. FERCH:  Thank you.

17          THE COURT:  All right, thank you.  So --

18          MS. ROSSMAN:  Thank you, your Honor.  If you have a

19   specific question, I can answer that, or I can address the

20   points in turn, whichever your Honor would prefer.

21          THE COURT:  Well, I don't think you need to go into

22   abstention.

23          MS. ROSSMAN:  Understood, your Honor.

24          THE COURT:  But on the standing issue, the question

25   is, you've said you want to basically record, audio record

1    police officers.

2          MS. ROSSMAN:  Correct, your Honor.

3          THE COURT:  You haven't talked about teachers, judges,

4    MBTA operators or whatever.  So how far does your request

5    extend?  Is it just to police officers?

6          MS. ROSSMAN:  That's exactly it, your Honor.  The

7    plaintiffs have asserted in a detailed complaint both when and

8    why there are instances where they want to secretly record

9    police officers performing their duty in public.  It's narrowly

10    connected to exactly their First Amendment right, which has

11    been recognized in *Glik* to record police officers performing

12    their duty in public.  And *Glik* goes into some of the reasons,

13    your Honor, why the First Amendment particularly protects that

14    right to record when it comes to police officers.  Police

15    officers are unique in our jurisprudence, in that they have the

16    power to command things from citizens.  They have the right to

17    take away our liberty.  They have the right to use force

18    against citizens, and with that great power comes an especial

19    responsibility to be held accountable to the public.  That's

20    discussed in both *Glik* and *Gericke* in the First Circuit, *Hill,*

21    as the Supreme Court discusses as well, why police officers are

22    treated differently.  So this is a very narrow request, your

23    Honor, on the part of plaintiffs to exercise their constitutional

24    right to record police officers.

25          If I may just very quickly address standing.  The fact

1   that both of the defendants have refused to disavow enforcement

2   of the wiretap statute against the exact behavior that

3   plaintiffs discuss wanting to undertake in the complaint, and,

4   again, those are detailed allegations of different situations

5   where they would want to secretly record police officers, why

6   they would want to do so and when they would want to do so,

7   those two things coupled together, both pre- and post-*Clapper*,

8   satisfy what is required for a pre-enforcement case, which is

9   exactly what we have here today.  It fits squarely into what

10  the Supreme Court did in *Susan B. Anthony*, your Honor.

11          THE COURT:  So one of the more interesting legal

12  issues was this issue of whether you can have a custom or

13  policy if you're simply enforcing clear state law that's been

14  upheld by the Supreme Judicial Court.  The Seventh seemed to

15  say, no, that's not a custom and policy; that's law.  The

16  Second seemed to say, well, maybe, and they remanded it

17  under -- I felt sorry for the District Judge.  I wouldn't have

18  known what to have done.  So if you have discretion to enforce

19  a state law but it's a state law, does it become custom and

20  policy of the municipality?  I must say, the First Circuit

21  hasn't really weighed in, and I'm not sure what to do.

22          MS. ROSSMAN:  Absolutely, your Honor.  I want to

23  address a bit of what the Second Circuit did in *Vives*, but just

24  beforehand I want to clarify.  While the Seventh Circuit in

25  *Surplus* -- that's language that's cited, I know, at length in

1    the Commissioner's brief —— subsequent cases in the Seventh

2    Circuit, that's both the *Snyder* case and the *Bethesda* case that

3    are cited in our brief, have read *Surplus* to actually fit into

4    the rubric that *Vives* was talking about in the Second Circuit.

5    So that is to say, a mandatory statute cannot create a

6    municipal liability, but when you have an authorizing statute

7    plus some affirmative action, that could be a policy; and what

8    *Snyder* and *Bethesda* did was simply read *Surplus* into that first

9    category.  But that's not what ——

10           THE COURT:  What's a mandatory statute?

11           MS. ROSSMAN:  So the examples, your Honor, typically

12   occur outside of the criminal statute context.  So, for example,

13   the *Snyder* case was addressing a statute that required county

14   voter registrars to remove the names of individuals from the

15   voter rolls when they had been convicted of a felony.  And it

16   was a binary.  They had no choice.  They had to remove those

17   names.  Typically in criminal statutes, those are not mandatory

18   statutes, your Honor, and that, again, is what the Second

19   Circuit talked about in *Vives*.  But the Second Circuit also

20   included protections for municipalities.  It is not simply that

21   by enforcing a state law you automatically trigger a *Monell*

22   policy for which a municipality can be held liable.  What *Vives*

23   said is, there needs to be some affirmative step on the part of

24   the municipality; and what the Second Circuit looked to there

25   was the fact that in the training manuals, the police department

1    singled out the particular statute at issue and had given

2    examples of what would violate that statute, and that was

3    sufficient to require additional fact-finding.  At that point

4    it was before the District Court.  Here, your Honor, the

5    plaintiffs are simply asking for the ability to continue with

6    this case and to be able to take discovery on this issue,

7    including many issues but one of which is the policy.

8          THE COURT:  Well, as I read the quotes about the

9    training, it seemed a correct interpretation of state law.

10         MS. ROSSMAN:  There's no allegation, your Honor, that

11   there is an incorrect interpretation about what the wiretap

12   statute is saying.  This is not a failure-to-train case or an

13   allegation that the department has inaccurately interpreted the

14   statute.  But what you do have --

15         THE COURT:  So you're saying that training someone to

16   do exactly what the statute and the SJC say can be a custom and

17   policy?  Is that what you think the current law is in the

18   Second Circuit?

19         MS. ROSSMAN:  I think it is at least here, your Honor,

20   for two reasons:  First, at least to our knowledge, there is

21   not a training video on every single statute that exists in

22   Massachusetts, every criminal statute that exists in

23   Massachusetts.  So what we have here is an indication that the

24   police department has put resources behind and has prioritized

25   training their law enforcement officers that "This is something

1    that we are going to enforce, and here is how we're going to

2    enforce it."  But even if that were not enough, we actually

3    have an additional component here, your Honor, and that is, in

4    addition to directing the officers' attention to the fact that

5    the statute exists, and the fact that it prohibits secret

6    recording, and that they have a power of arrest if someone

7    violates it, the only examples that are provided, both in the

8    bulletin and in the video, involve secret recording of police

9    officers.  This is not a case where the Boston Police Department

10   chose to train its officers on every way you could violate the

11   wiretap statute or even some of the ways you could violate the

12   wiretap statutes.  What it was telling its police officers was

13   that "When you are secretly recorded performing your duties in

14   public, you have a right of arrest of that individual under the

15   wiretap statute."  And that's exactly the kind of affirmative

16   step under *Vives* and also under the Sixth, Ninth, and Eleventh

17   Circuit cases that we cited in our brief that would be

18   sufficient to establish a policy, certainly sufficient enough

19   at this early stage of the litigation where there hasn't been

20   additional fact discovery on that policy question.

21           THE COURT:  So as the ACLU, would you be opposed to

22   expanding it beyond police officers?

23           MS. ROSSMAN:  Your Honor, the complaint here today on

24   behalf of our plaintiffs is purely looking at the recognized

25   constitutional right to record police officers performing their

1    duties in public.

2              THE COURT:  So with respect to victims or confidential

3    informants or all the, I don't know, day-to-day encounters a

4    police officer might have, you're not saying you have the right

5    to record those?

6              MS. ROSSMAN:  Your Honor, I think that question gets

7    to what would be the second step of the First Amendment

8    analysis, so if I may perhaps walk you into the First

9    Amendment.

10             THE COURT:  Yes.

11             MS. ROSSMAN:  So to be clear, the First Amendment

12   right that's being asserted here is the right to record police

13   officers performing their duty in public.  Plaintiffs want to

14   exercise that constitutional right secretly.  The wiretap

15   statute criminalizes it, and ultimately the question that will

16   be before this Court is whether that regulation of the

17   constitutional right is a reasonable time, place, and manner

18   restriction.  And in that analysis, this Court can be looking

19   at what the government interests are, whether this regulation

20   is narrowly tailored; and exactly those fact questions that

21   you're talking about, your Honor, with respect to if there's a

22   third party involved could be handled at that stage of the

23   proceedings.  But that requires a record.  That requires

24   assertions from the government about what its interest is, and

25   it requires discovery.  That's not where we are here today.

1          THE COURT:  Let me say, there's a parallel case here,

2     the *Project Veritas* case.  I don't know if these folks are

3     here.  They've unfortunately had to wait because I didn't want

4     to do one case without another case.  I think there are some

5     overlapping issues.  But they basically take the position that

6     it's not just limited to police officers, as I understand it;

7     it's a much broader right which has to do with reasonable

8     expectation of privacy, like a broader standard.

9          MS. ROSSMAN:  That's right, your Honor.  Of course, we

10    are not in that case, but my understanding is similar, that it

11    is a broader right that they are asserting there.  And those

12    types of assertions, your Honor, means that different

13    governmental interests and different questions with respect to

14    narrow tailoring may be raised in the ultimate First Amendment

15    analysis.  But here it is a much narrower claim that's being

16    brought before this Court, but that core right under the First

17    Amendment that's been recognized by *Glik* and affirmed in

18    *Gericke* are the right to record police officers performing

19    their duty in public.  The complaint puts forward a plausible

20    claim that the government's regulation of that is not a

21    reasonable time, place, and manner restriction, and that's

22    exactly what the plaintiffs --

23          THE COURT:  So this is very much an "as applied," and

24    you're not seeking to expand it in any way broader than the

25    police officer himself or herself?

1          MS. ROSSMAN:  Well, your Honor, I would qualify that,

2     in that our complaint does talk about several instances in

3     which our plaintiffs would like to record police officers.

4     Some involve one-on-one interactions; some may involve a third

5     party.  I would say that that doesn't make our complaint

6     unclear.  It makes it detailed and sets forward a host of times

7     that our plaintiffs wish to engage in this kind of behavior.

8     And in the discovery phase, your Honor, that's where we would

9     be able to look into --

10          THE COURT:  You keep talking about discovery.  You

11     haven't moved for a preliminary injunction, right?

12          MS. ROSSMAN:  We have not, your Honor.

13          THE COURT:  So I'm trying to figure out what you're

14     going to get from discovery.  In other words, it's --

15          MS. ROSSMAN:  Well, your Honor, for instance, I

16     think --

17          THE COURT:  I think I've stayed discovery till I

18     figure this out.

19          MS. ROSSMAN:  That's correct, your Honor, and we have

20     submitted a joint stay.  We had agreed that it made sense to

21     stay discovery until your Honor had ruled on this motion, but I

22     think some of the questions that have been raised in court

23     today go to core issues that would be appropriate to look into

24     at discovery:  What is the extent of the Boston Police

25     Department's policy on this issue?  We to this point have not

1    been able to get the arrest records from the police department.

2    What our complaint alleges are six times that we know the

3    statute has been enforced, but of course at discovery that

4    would be something that we would be able to seek additional

5    information on.

6            And then, finally, to this point, your Honor, the

7    government has not put forward any assertion about what its

8    interest is in enforcing this statute as applied to the secret

9    recording of police officers, let alone why that would be

10   narrowly tailored, and so those types of issues would be ripe

11   for discovery.

12           THE COURT:  All right, thank you.

13           MS. ROSSMAN:  Thank you, your Honor.

14           THE COURT:  Do you want to respond at all?

15           MR. McGARRY:  If I may, your Honor.  First, I'd like

16   to simply address some of the comments on discovery here.  To

17   the extent that Ms. Rossman anticipates discovery will sort of

18   reveal further jurisdictional issues here, there's no dispute

19   as to the jurisdictional issues.  The city doesn't deny that

20   Commissioner Evans may enforce the statute, and any amount of

21   discovery isn't going to remedy the critical issues here with

22   causation and --

23           THE COURT:  Well, how many times has someone been

24   arrested under the statute against police officers?

25           MR. McGARRY:  I'm not sure as to Boston Police, your

1    Honor.  I don't know the answer to that question, but it's

2    certainly not alleged in the complaint, and in fact there are

3    no specific allegations in the complaint that anybody has been

4    arrested by the Boston Police for violation of the statute.

5    Regardless, causation and redressability are critical

6    components of standing that are not going to be able to be

7    addressed by any amount of discovery here.  As I mentioned

8    earlier --

9            THE COURT:  Wasn't *Glik* the Boston Police?

10           MR. McGARRY:  It was.

11           In addition to the discovery comments, I'd also like

12   to address the custom or policy argument that Ms. Rossman

13   advanced.  Although citing to some cases, including *Vives,* that

14   are outside the circuit, to the extent that the issue has been

15   treated in the First Circuit at all, it's been in the

16   concurrence in the *Yeo* opinion and in Judge Gorton's opinion in

17   *Boston Taxi Owners v. City of Boston,* and in both of those

18   cases, the language of *Surplus Store* has been referred to and

19   adopted.

20           With regard to Ms. Rossman's emphasis on mandatory

21   versus non-mandatory statutes, I'm not sure how that issue

22   comes up here because the state statute clearly says that

23   people who violate it shall be arrested.

24           THE COURT:  Does it use the word "shall"?

25           MR. McGARRY:  Yes, it does, your Honor.

1           THE COURT:  Well, I find that issue the most

2    intriguing of the bunch of them actually.  If I find that they

3    have standing, and I'm not going to abstain, and that there are

4    First Amendment issues here as applied, most of which I'm

5    tempted with, I'm not quite sure what I do with the fact that

6    it's a state statute.

7           MR. McGARRY:  And to the extent that --

8           THE COURT:  Rather than a custom or a policy, it's

9    derived directly from a statute upheld by the SJC, so it's an

10   odd procedural context.  On the other hand, there's got to be a

11   remedy here.  So I'm trying to figure out whether I just do a

12   declaration that it's unlawful, if I go that route, or whether

13   I actually do an injunction.  I mean, I think that's where this

14   comes out, right?

15          MR. McGARRY:  In either case, your Honor,

16   Commissioner Evans isn't the proper defendant for either of

17   those actions.

18          THE COURT:  Well, it would be the city or the state,

19   but, in any event, there's got to be some remedy if it violates

20   the First Amendment.  I think *Susan B. Anthony* was against a --

21   who was that against?  That was against Ohio, right?  It was

22   the -- I forget.  It sounds like a minor point, except I have

23   to figure out what the remedy would be.  A number of these are

24   against the cities.

25          MR. McGARRY:  To your Honor's point, I don't think

1    that, taking the language from *Yeo* and from *Boston Taxi Owners*,

2    that the city would be a proper defendant either.  When I refer

3    to Commissioner Evans, I'm referring by extension to the City

4    of Boston because under *Monell*, a suit against the Commissioner

5    in his official capacity.

6            THE COURT:  But you've got to help me here.  You're an

7    officer of the court.  If in fact I find it violates the First

8    Amendment, the statute, and the police are enforcing the

9    statute in ways that violate the First Amendment -- not their

10   fault in the sense that that's what the statute says -- what is

11   the correct defendant?

12           MR. McGARRY:  The Commonwealth of Massachusetts, your

13   Honor.

14           THE COURT:  That doesn't violate the -- sort of I'd

15   have to do an *Ex parte Young*?  Is that it?  I mean, I don't

16   even -- you can't sue the Commonwealth in Federal Court.  So,

17   anyway, you're guessing.

18           Let me ask the ACLU plaintiff that.

19           MS. ROSSMAN:  Thank you, your Honor.  It can't

20   possibly be, unless Mr. McGarry would say otherwise, that

21   Commissioner Evans is saying that he has to arrest every

22   individual who violates the statute.  And just to be clear

23   about the "shall" language that we're talking about, this is in

24   Subsection C of the statute, your Honor, when it's describing

25   the offenses, and it says that "Any person who willfully

1  commits an interception --" and then it goes through the many

2  ways that you can do that -- "shall be fined not more than

3  $10,000 or imprisoned in the state prison."

4       So the way the "shall" is being used there is to

5  describe what the offense is.  Certainly in most state

6  statutes, criminal statutes, the language "shall" I believe is

7  used to describe what the offense is.  It is not "shall be

8  arrested, has no other choice but to arrest."  So I simply

9  don't think that these types of criminal statutes falls into

10  that mandatory language.

11       THE COURT:  Well, it's almost never mandatory to

12  arrest somebody.  There's always an element of discretion as to

13  who to arrest and who to prosecute.  I mean, I can't think

14  of -- even, I mean, we do it here in the courthouse all the

15  time, alternatives to disposition.  There's a huge amount of

16  discretion in the law enforcement officials as well as in the

17  prosecuting.  That said, something was going on between the

18  Seventh and the Second that the First has only referred to in

19  passing, and I'm just not sure what the remedy is.

20       MS. ROSSMAN:  Absolutely, your Honor.  And for me,

21  what I think is critical is that *Vives* doesn't simply limit it

22  to, every statute that is authorizing therefore automatically

23  creates a policy.  It does state clearly that you need to have

24  an affirmative action, like specifically prioritizing and

25  putting resources behind training on that statute, in order to

1   trigger liability.  And that really reflects the kind of

2   balancing that the *Owens* decision out of the Supreme Court held

3   where it was looking at whether or not qualified immunity

4   that's in good-faith standard would apply to municipalities,

5   and the Court held that it didn't, and that was because it

6   wanted to insure that it was incentivizing municipalities to

7   err on the side of constitutionality, and that was the proper

8   way to balance the interests of the individual and the

9   interests of the city.  And the *Vives* test that's laid out

10  here I think --

11          THE COURT:  So you're saying, if they had no training,

12  nothing in the training manual at all, they'd be off the hook?

13          MS. ROSSMAN:  I believe, your Honor, if there was

14  nothing in the training manual and there was no other evidence

15  of a policy.  Again, of course, right now we're only going on

16  what was publicly available, but I do think the critical

17  component here about why there's municipal liability is, out of

18  the entire penal code -- I mean, I know for a certain period of

19  time, I don't know if it is still the case --

20          THE COURT:  But they might just have been wanting to

21  teach people you shouldn't do it if they're filming openly.  In

22  other words, they were afraid of the liability the flip way

23  after *Glik*.  I mean, you don't know how -- I guess that's what

24  discovery would show.

25          MS. ROSSMAN:  That is correct, your Honor.  That's why

1    it's also important that this was not just an instance where

2    they said, you know, "Open recording, you can't arrest someone

3    under the wiretap statute," or, "Open recording, you can't

4    arrest someone under the wiretap statute, and here are all the

5    ways you can violate it by secret recording."  It simply

6    focused, as its examples of what violated the wiretap statute,

7    secret recording of police officers; and that singling out in

8    that very specific description of what would allow an officer

9    to have the right of arrest, that's the kind of affirmative

10    action that triggers *Monell*.

11           THE COURT:  All right, well, thank you.

12           MS. ROSSMAN:  Thank you.

13           THE COURT:  I was going to ask -- I don't know that

14    it's quite relevant -- Boston is now doing its own video

15    recording, right, with the police officers?

16           MR. McGARRY:  Thank you, your Honor.  It's something

17    that was actually mentioned in DA Conley's brief, that there

18    may be an issue going forward of mootness if a policy of body

19    cameras is adopted by the Boston Police.

20           THE COURT:  Does that somehow suggest a waiver that if

21    they do it, then people can do it, citizens, reporters?

22           MR. McGARRY:  No, your Honor.  I don't think we're at

23    a point where we can argue what the implications of that

24    program would be, so that's not something --

25           THE COURT:  Has it been adopted flat out?

1          MR. McGARRY:  I don't believe so.

2          THE COURT:  Is it audio as well as video?

3          MR. McGARRY:  If I may, my cocounsel may be able to

4     speak to that a little more accurately.

5          MR. GERAGHTY:  Your Honor, it's a pilot program with

6     an initial six-month duration, and it is audio and video.  It's

7     a camera that's mounted on the officer's chest.

8          THE COURT:  I wonder how that gets around this

9     Section 99.  I suppose it's considered open so that the suspect

10    or victim theoretically would know about it.  Is that the

11    theory?

12         MR. GERAGHTY:  Your Honor, I believe that's the case.

13    I wasn't involved with the roll-out of the policy, so I'm not

14    familiar with the specific sections of the policy, but that is

15    my understanding.

16         THE COURT:  I have the image of the suspect and the

17    police just approaching each other with cameras blaring.

18         All right, well, it's very, very interesting.  I'm

19    somewhat regretful as I'm seeing how long this is taking to

20    argue all of this, but I understand that I owe *Project*

21    *Veritas* -- who's here from *Project Veritas*?  There must be

22    someone.  No one?  Oh, my goodness, they're probably just

23    recording us.

24         (Laughter.)

25         THE COURT:  But, in any event, I owe them an opinion.

 1    I owe you all an opinion.  I will take this under advisement.

 2    And it's very well briefed, and I appreciate the seriousness of

 3    the issues here.  You've all had a busy few weeks.  So I will

 4    just take this under advisement.

 5         I'm torn about, if I deny the motion to dismiss, how

 6    much discovery is really necessary here.  It strikes me as

 7    pretty darn limited, so that I can get to the merits of the

 8    thing.  Do you need another scheduling conference once I issue

 9    an opinion, or is it something that I should just pluck out of

10    the air, how much time it is?

11         MR. McGARRY:  So, your Honor, if I may, the parties

12    have submitted a joint motion that sort of characterizes the

13    dates that we want from the date of completion, so that if the

14    Court chooses a commencement date --

15         THE COURT:  I don't need to see you back again.

16         MR. McGARRY:  Correct.

17         THE COURT:  You don't want to see me for a while.

18    That's fine.  That sounds good.  Thank you very much.  And I

19    take it -- I usually say, "Settlement, anyone want settlement?"

20    I'm wondering whether this is something that could be a mutual

21    rapprochement.

22         MR. McGARRY:  If I may, your Honor, the ACLU has

23    submitted a settlement demand which the Commissioner has

24    rejected before, before today's conference.

25         THE COURT:  All right, so this is a matter of

 1   important public policy, so I wouldn't do my usual, "Are you

 2   sure you don't want to go to a mediator?"  But is it something

 3   that would be useful if you went to somebody?  I don't know

 4   what people are doing in other cities and that sort of thing.

 5        MS. ROSSMAN:  I don't think so at this time, your

 6   Honor.

 7        THE COURT:  Okay.

 8        MR. FERCH:  Well, and I was going to say, your Honor,

 9   I forwarded on to my client, but, again, he's only one DA, and

10   I'm also wearing two hats on behalf of the DA and the Attorney

11   General's office as the statewide prosecutor, so --

12        THE COURT:  Oh, you're with the AG?

13        MR. FERCH:  I am, your Honor.

14        THE COURT:  Well, would she like to settle this

15   matter?

16        MR. FERCH:  Uhm, like I said, I started with my

17   statement and I'll stick with that, that nobody doubts the

18   important elements here, but we don't think the plaintiffs have

19   standing.

20        I just wanted to -- I know you're wrapping up, but if

21   I could just make a few points briefly because I haven't been

22   allowed to.  If you do allow jurisdiction, we think it could be

23   narrow, but we also do think that discovery on jurisdiction for

24   standing certainly would need to go forward.  Again, to

25   highlight the lack of prosecution, I think it's important to

1    look at in the motion to dismiss.

2          I also want to point out that -- I don't want to get

3    into the merits, but any suggestion that the Commonwealth

4    doesn't have an interest in protecting the rights of victims,

5    because the plaintiffs are refusing to narrow the scope of

6    their complaint, just isn't going to stand, so on that --

7          THE COURT:  Well, since you do represent -- I had

8    forgotten you represent not just the District Attorney but the

9    Commonwealth --

10         MR. FERCH:  Well, I've got to be careful on that one.

11         THE COURT:  So can I say that you're the proper

12   defendant here, the Commonwealth?  Isn't there a -- going back

13   to my Federal Courts stays, I think I can't even -- I think I'd

14   have to go into some sort of *Ex parte Young* mode, wouldn't I?

15         MR. FERCH:  On that one, I believe -- the *Susan B.*

16   *Anthony* case was not the State of Ohio.  That was someone by

17   the name of *Driehaus*.  I don't know who exactly that was.

18         THE COURT:  It must have been someone in the Election

19   Commission or something.

20         MR. FERCH:  Yeah.  Well, and *Susan B. Anthony* involved

21   the actual commission itself that was approving the billboards.

22   The other one, I know the Seventh Circuit case with the ACLU

23   was against I believe the city or Cook County.  I don't believe

24   the AG or the Commonwealth would be the proper respondent, but

25   I can't -- I know there's Eleventh Amendment issues.

1          THE COURT:  I know as soon as you become the

2    defendant, I get the motion to dismiss on -- the Eleventh

3    Amendment is damages, but even with an injunction, I know there

4    are limits on what you can do to a state sovereignty.

5          MR. FERCH:  There's things banging around in my head

6    on that point, but I don't want to misstate.

7          THE COURT:  But I'm not even sure who the defendant

8    would be.  It wouldn't be the Attorney General because you

9    don't control what the city does.

10          MR. FERCH:  That's correct.

11          THE COURT:  So I don't know that that's an appropriate

12    remedy.  But I will think about it with my brilliant law clerks

13    in trying to figure this out.  And I thank you very much, and

14    we'll take it in recess, all right?

15          MR. FERCH:  Thank you, your Honor.

16          THE CLERK:  All rise.

17          (Adjourned, 3:25 p.m.)

18

19

20

21

22

23

24

25

1                      C E R T I F I C A T E

2


3
     UNITED STATES DISTRICT COURT )
4    DISTRICT OF MASSACHUSETTS    ) ss.
     CITY OF BOSTON               )
5


6


7           I, Lee A. Marzilli, Official Federal Court Reporter,

8    do hereby certify that the foregoing transcript, Pages 1

9    through 37 inclusive, was recorded by me stenographically at

10   the time and place aforesaid in Civil Action No. 16-11362-PBS,

11   K Eric Martin, et al v. William B. Evans, et al, and thereafter

12   by me reduced to typewriting and is a true and accurate record

13   of the proceedings.

14          Dated this 11th day of September, 2017.

15


16


17


18


19              /s/ Lee A. Marzilli

20              _____
                LEE A. MARZILLI, CRR
                OFFICIAL COURT REPORTER
21


22


23


24


25