# United States Court of Appeals
## For the First Circuit

---

Nos. 19-1586, 19-1640

PROJECT VERITAS ACTION FUND,

Plaintiff, Appellee / Cross-Appellant,

v.

RACHAEL S. ROLLINS, in her official capacity as
District Attorney for Suffolk County,

Defendant, Appellant / Cross-Appellee.

---

No. 19-1629

K. ERIC MARTIN & RENÉ PÉREZ,

Plaintiffs, Appellees,

v.

RACHAEL S. ROLLINS, in her official capacity as
District Attorney for Suffolk County,

Defendant, Appellant,

WILLIAM G. GROSS, in his official capacity as
Police Commissioner for the City of Boston,

Defendant.

---

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Patti B. Saris, U.S. District Judge]

---

Before

Barron, <u>Circuit Judge</u>,
Souter,[*] <u>Associate Justice</u>,
and Selya, <u>Circuit Judge</u>.

---

<u>Eric A. Haskell</u>, Assistant Attorney General of Massachusetts, with whom <u>Maura Healey</u>, Attorney General of Massachusetts, was on brief, for Appellant/Cross-Appellee Rachael S. Rollins.

<u>Benjamin T. Barr</u>, with whom <u>Steve Klein</u> and <u>Statecraft PLLC</u> were on brief, for Appellee/Cross-Appellant Project Veritas.

<u>Jessie J. Rossman</u>, with whom <u>Matthew R. Segal</u>, <u>American Civil Liberties Union Foundation of Massachusetts, Inc.</u>, <u>William D. Dalsen</u>, and <u>Proskauer Rose LLP</u> were on brief, for Appellees K. Eric Martin and René Pérez.

<u>Adam Schwartz</u> and <u>Sophia Cope</u> on brief for Electronic Frontier Foundation, amicus curiae.

<u>Bruce D. Brown</u>, <u>Katie Townsend</u>, <u>Josh R. Moore</u>, <u>Shannon A. Jankowski</u>, <u>Dan Krockmalnic</u>, <u>David Bralow</u>, <u>Kurt Wimmer</u>, <u>Covington & Burling LLP</u>, <u>Joshua N. Pila</u>, <u>James Cregan</u>, <u>Tonda F. Rush</u>, <u>Mickey H. Osterreicher</u>, <u>Robert A. Bertsche</u>, <u>Prince Lobel Tye LLP</u>, <u>David McCraw</u>, <u>Elizabeth C. Koch</u>, <u>Ballard Spahr LLP</u>, <u>D. Victoria Baranetsky</u>, <u>Bruce W. Sanford</u>, <u>Mark I. Bailen</u>, and <u>Baker & Hostetler LLP</u> on brief for The Reporters Committee for Freedom of the Press; The American Society of Magazine Editors; Boston Globe Media Partners, LLC; First Look Media Works, Inc.; The Media Institute; Meredith Corporation; MPA - The Association of Magazine Media; National Freedom of Information Coalition; National Newspaper Association; National Press Photographers Association; New England First Amendment Coalition; The New York Times Company; Politico, LLC; Reveal from the Center for Investigative Reporting; Society of Environmental Journalists; Society of Professional Journalists; and Tully Center for Free Speech, amici curiae.

<u>Oren N. Nimni</u> and <u>Lauren A. Sampson</u> on brief for Lawyers for Civil Rights, Center for Constitutional Rights, and LatinoJustice PRLDEF, amici curiae.

<u>Nicolas Y. Riley</u> and <u>Robert D. Friedman</u> on brief for Institute for Constitutional Advocacy and Protection, amicus curiae.

---

[*] Hon. David H. Souter, Associate Justice (Ret.) of the Supreme Court of the United States, sitting by designation.

December 15, 2020

**BARRON**, <u>Circuit Judge</u>.  Massachusetts, like other states concerned about the threat to privacy that commercially available electronic eavesdropping devices pose, makes it a crime to record another person's words secretly and without consent.  But, unlike other concerned states, Massachusetts does not recognize any exceptions based on whether that person has an expectation of privacy in what is recorded.  <u>See</u> Mass. Gen. Laws ch. 272, § 99 ("Section 99").  As a result, Massachusetts makes it as much a crime for a civic-minded observer to use a smartphone to record from a safe distance what is said during a police officer's mistreatment of a civilian in a city park as it is for a revenge-seeker to hide a tape recorder under the table at a private home to capture a conversation with an ex-spouse.  The categorical and sweeping nature of Section 99 gives rise to the important questions under the First Amendment to the United States Constitution that the challenges that underlie the consolidated appeals before us present.

The first appeal that we address stems from a 2016 suit filed in the District of Massachusetts by two civil rights activists in Boston -- K. Eric Martin and René Pérez ("the Martin Plaintiffs").  They allege that Section 99 violates the First Amendment insofar as it criminalizes the secret, nonconsensual audio recording of police officers discharging their official duties in public spaces.  The other appeal that we address stems

from a suit filed in that same year in that same district -- and eventually resolved by the same district court judge -- by Project Veritas Action Fund ("Project Veritas"), which is a national media organization dedicated to "undercover investigative journalism."

Project Veritas's suit targets Section 99 insofar as it bans the secret, nonconsensual audio recording of <u>any</u> government official discharging official duties in public spaces, as well as insofar as it bans such recording of any person who does not have a reasonable expectation of privacy in what is recorded. Project Veritas also alleges that Section 99 must be struck down in its entirety pursuant to the First Amendment doctrine of overbreadth.

We affirm the District Court's grant of summary judgment to the Martin Plaintiffs, based on its ruling that Section 99 violates the First Amendment by prohibiting the secret, nonconsensual audio recording of police officers discharging their official duties in public spaces. We also affirm the District Court's order dismissing Project Veritas's First Amendment overbreadth challenge for failing to state a claim on which relief may be granted. However, we vacate on ripeness grounds the District Court's order dismissing with prejudice Project Veritas's First Amendment challenge to Section 99 insofar as that statute prohibits the secret, nonconsensual audio recording of individuals who lack an expectation of privacy in what is recorded. For the same reason, we vacate the District Court's grant of summary

judgment to Project Veritas on its claim that Section 99 violates the First Amendment insofar as that statute bars the secret, nonconsensual audio recording of government officials discharging their duties in public. We remand the claims asserting these two latter challenges to the District Court with instructions to dismiss them without prejudice for lack of subject matter jurisdiction.

## I.

We begin by reviewing the background that led to the enactment of Section 99, its key terms, and the way that the Supreme Judicial Court of Massachusetts ("the SJC") construes them. We then describe the travel of the two cases.

### A.

In 1964, Massachusetts created a commission to study whether to strengthen the Commonwealth's prohibitions on electronic eavesdropping. The commission issued its final report in June of 1968, which found "that eavesdropping devices are readily available to members of the public from commercially available stores" and that these devices make it quite easy for even laypeople to use them "for purposes of illegally intercepting wire or oral communications." Report of the Special Commission on Electronic Eavesdropping, 1968 Mass. Sen. Doc. No. 1132, at 6 ("1968 Commission Report"). The report recommended "that wiretapping and eavesdropping other than by law enforcement

officers should be strictly prohibited," and it proposed the adoption of an "'all-party consent' provision," "which would require the consent of all parties to a conversation before that conversation could be recorded or otherwise electronically 'intercepted.'" Id. at 9, 11.

A month later, the Massachusetts legislature enacted Section 99, which states in its preamble "that the uncontrolled development and unrestricted use of modern electronic surveillance devices pose grave dangers to the privacy of all citizens of the commonwealth." Mass. Gen. Laws ch. 272, § 99(A). The measure goes on to make it a crime for "any person" to "willfully commit[] an interception, attempt[] to commit an interception, or procure[] any other person to commit an interception or to attempt to commit an interception of any wire or oral communication." Id. § 99(C)(1).

Section 99 defines a "wire communication" as "any communication made in whole or in part through the use of facilities for the transmission of communications by the aid of wire, cable, or other like connection between the point of origin and the point of reception." Id. § 99(B)(1). An "oral communication" is defined as "speech, except such speech as is transmitted over the public air waves by radio or other similar device." Id. § 99(B)(2). The term "interception" is defined as follows: "to secretly hear, secretly record, or aid another to

- 7 -

secretly hear or secretly record the contents of any wire or oral communication through the use of any intercepting device by any person other than a person given prior authority by all parties to such communication."  Id. § 99(B)(4).

**B.**

Roughly a decade after Section 99's enactment, the SJC construed the measure in Commonwealth v. Jackson, 349 N.E.2d 337 (Mass. 1976), which concerned, among other things, whether audio recordings of a kidnapper's ransom calls had been made in violation of Section 99.  Id. at 339.  In holding that they had been, the SJC agreed that even a recording of the audio of a person who had no "reasonable expectation of privacy" in what was recorded could fall under Section 99's prohibition.  Id. at 340.

The SJC explained that if it "were to interpret 'secretly' as encompassing only those situations where an individual has a reasonable expectation of privacy," it "would render meaningless the Legislature's careful choice of words" in Section 99.  Id.  The SJC concluded that a nonconsensual audio recording is made "secretly" -- and thus in violation of Section 99 -- if the person recorded does not have "actual knowledge of the recording."  Id.  The SJC added that actual knowledge of the recording could be "proved where there are clear and unequivocal objective manifestations of knowledge."  Id.

Some years later, in <u>Commonwealth</u> v. <u>Hyde</u>, 750 N.E.2d 963 (Mass. 2001), the SJC again held that Section 99 did not impliedly exempt recordings of audio of persons who lacked an expectation of privacy in what was recorded. <u>Id.</u> at 965-66. This time, unlike in <u>Jackson</u>, the issue arose in connection with a prosecution for a violation of Section 99 itself. In the case, the criminal defendant had been charged with violating that statute for having recorded the audio of his encounter with police -- without the officers' knowledge -- during a traffic stop. <u>Id.</u> at 964-65. The defendant moved to dismiss the criminal complaint against him on the ground that Section 99 did not apply to recordings of "police officers . . . performing official police duties." <u>Id.</u> at 965. In such a situation, the defendant contended, the officers "had no privacy expectations in their words, and, as a result, their conversation should not be considered 'oral communication' within the statute." <u>Id.</u>

The SJC affirmed the denial of the defendant's motion by explaining that "[t]he statute is carefully worded and unambiguous, and lists no exception for a private individual who secretly records the oral communications of public officials." <u>Id.</u> at 966. For that reason, the SJC held, "the plain language of the statute accurately states the Legislature's intent" and nothing in that language "would protect, on the basis of privacy rights, the recording that occurred here," regardless of "[t]he

value of obtaining probative evidence of occasional official misconduct." Id. at 966-69.

The SJC emphasized that "[t]he commission clearly designed the 1968 amendments to create a more restrictive electronic surveillance statute than comparable statutes in other States." Id. at 967. In fact, the SJC explained, to permit the recording "on the ground that public officials are involved" would necessarily permit the secret, nonconsensual recording "of virtually every encounter or meeting between a person and a public official, whether the meeting . . . is stressful . . . or nonstressful (like a routine meeting between a parent and a teacher in a public school to discuss a good student's progress)." Id. at 970. "The door once opened would be hard to close, and the result would contravene the statute's broad purpose and the Legislature's clear prohibition of all secret interceptions and recordings by private citizens." Id.

Hyde did note, however, that "[t]he problem . . . could have been avoided if, at the outset of the traffic stop, the defendant had simply informed the police of his intention to tape record the encounter, or even held the tape recorder in plain sight." Id. at 971 (emphasis added). In this way, Hyde clarified Jackson's prior holding about what constituted "secretly" recording under Section 99.

The dissenting opinion in Hyde asserted that neither Section 99's text nor its legislative history indicated "that the Legislature had in mind outlawing the secret tape recording of a public exchange between a police officer and a citizen." Id. at 974 (Marshall, C.J., dissenting). To support this narrower understanding of the measure, the dissent offered an example that remains all too relevant today. It claimed that, under the majority's ruling, George Holliday "would have been exposed to criminal indictment rather than lauded for exposing an injustice," if his then-recent recording of Rodney King's beating at the hands of police officers in Los Angeles, California had taken place in Massachusetts. Id. at 972.

The majority responded that "[t]here is no basis to ignore the plain language and legislative history" of Section 99, "or our case law interpreting it, in favor of speculation as to how an imaginary scenario might have played out, had the Rodney King episode occurred in Massachusetts and not in California." Id. at 971. The majority did assert, though, that "[a]lthough the Rodney King videotape visually captured the conduct of the police officers' [beating of] King, the recording was virtually inaudible, until electronic enhancements filtered the audio portion to allow the actual commands of the police officers to be heard." Id. at 971 n.11.

c.

The appeals before us arise from two different suits that challenge Section 99. But, while these suits ultimately intersected below, it is useful to describe their travel separately.

1.

On June 30, 2016, Martin and Pérez filed suit in the United States District Court for the District of Massachusetts against the Commissioner of the Boston Police Department ("BPD Commissioner") and the District Attorney for Suffolk County ("District Attorney") in their official capacities. We will refer to the BPD Commissioner and the District Attorney collectively as "the Defendants."

The Martin Plaintiffs' complaint alleges that they are civil rights activists who have regularly and openly recorded the audio of police officers without their consent as they discharge their official duties in public. Their complaint alleges that the Martin Plaintiffs would like to undertake that same type of recording secretly but fear doing so due to the criminal prohibition that Section 99 imposes. The Martin Plaintiffs' complaint alleges that others have been prosecuted by the District Attorney for such recording and that the BPD's "official training materials," including a "Training Bulletin" and "training video" distributed to police cadets in 2010, "instruct officers that they

- 12 -

may arrest and seek charges against private individuals who secretly record police officers performing their duties in public."

Based on these allegations, the complaint claims that Section 99 "as applied to secretly recording police officers engaged in their official duties in public places, violates the First Amendment by causing Plaintiffs to refrain from constitutionally protected information gathering" and from "encouraging, or aiding other individuals to secretly record police conduct in public." The complaint requests "declaratory and injunctive relief under 42 U.S.C. § 1983 and the First and Fourteenth Amendments to the United States Constitution" on the ground that Section 99 is unconstitutional when "applied to prohibit the secret audio recording of police officers performing their duties in public."

On September 30, 2016, the Defendants filed motions to dismiss for lack of jurisdiction under Federal Rule of Civil Procedure 12(b)(1) and for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). In March of 2017, the District Court denied both motions. Martin v. Evans, 241 F. Supp. 3d 276, 288 (D. Mass. 2017). Discovery proceeded for roughly a year before the parties filed dueling motions for summary judgment. The District Court granted summary judgment to the Martin Plaintiffs

on December 10, 2018.  <u>Martin</u> v. <u>Gross</u>, 340 F. Supp. 3d 87, 109
(D. Mass. 2018).

The District Court first rejected the Defendants'
contention that the Martin Plaintiffs' First Amendment claim was
not ripe for essentially the reasons set forth in its earlier
ruling rejecting the Defendants' 12(b)(1) motion.  <u>Id.</u> at 103.
But, the District Court added, discovery reinforced the basis for
that earlier ruling, as the plaintiffs had "attested to their prior
recordings of police officers" and "aver[red] that they desire to
secretly record police officers but have refrained from doing so
because of" Section 99, and "the defendants have sought criminal
complaints or charged persons for violating [the statute] numerous
times since 2011."  <u>Id.</u>  The District Court also noted that "the
government has not disavowed enforcement of" the statute.  <u>Id.</u>
Accordingly, the District Court determined that the "facts give
rise to a live controversy over genuine First Amendment injuries."
<u>Id.</u>

As to the merits, the District Court first addressed
whether the Martin Plaintiffs were bringing a "facial" or "as
applied" attack on Section 99.  The District Court explained that
the Martin Plaintiffs' challenge targets only a slice of what
Section 99 bans, and so in that sense was "as applied."  <u>Id.</u> at
105.  But, the District Court noted, the Martin Plaintiffs sought
relief that would "block the application of Section 99 to <u>any</u>

situation involving the secret recording of police officers . . . performing their duties in public, not just in a specific instance of the plaintiffs engaging in such conduct." Id. In that respect, the District Court concluded, the Martin Plaintiffs' challenge was facial in nature, notwithstanding that their challenge did not seek to invalidate Section 99 in its entirety. Id.

The District Court also explained that the Martin Plaintiffs' planned recording warranted at least some First Amendment protection, just as it had held in denying the Defendants' motion to dismiss. Id. at 96-98; see Martin, 241 F. Supp. 3d at 287-88. There, the District Court explained that it disagreed with the Defendants' contention that "the First Amendment does not provide any right to secretly record police officers," as it ruled that "[e]xisting First Circuit authority" -- namely Glik v. Cunniffe, 655 F.3d 78 (1st Cir. 2011), and Gericke v. Begin, 753 F.3d 1 (1st Cir. 2014) -- "holds otherwise." Martin, 241 F. Supp. 3d at 286.

The District Court then trained its attention on the level of First Amendment scrutiny that applied to Section 99's ban on the recording at issue. Martin, 340 F. Supp. 3d at 105. The District Court concluded that Section 99 was a content-neutral restriction on the time, place, or manner of the Martin Plaintiffs' planned speech-related activity and that, in consequence, the measure's prohibition was not subject to strict scrutiny. Id.

The District Court went on to subject the ban at issue to "intermediate scrutiny," noting that although the Defendants had suggested that an even less demanding level of scrutiny "might" apply, they had not developed an argument as to why that would be the case. Id. at 105-06. In addition, the District Court explained that our prior precedent did not support the application of less than intermediate scrutiny. Id. at 106 (first citing Glik, 655 F.3d at 82-84, then citing Jean v. Mass. State Police, 492 F.3d 24, 29 (1st Cir. 2007)).

Finally, the District Court evaluated Section 99's ban on such recording under intermediate scrutiny and determined that -- on its face -- it could not survive review due to its sweep. Id. at 106-08. Despite recognizing that, "[i]n this context, narrow tailoring does not require that the law be the least restrictive or least intrusive means of serving the government's interests," the District Court explained that the ban "is not narrowly tailored to protect a significant government interest when applied to law enforcement officials discharging their duties in a public place." Id. at 106-07. The District Court noted that Section 99 prohibits such recording even in circumstances in which police officers would have no expectation of privacy in what is recorded. Id. at 108. The District Court added that, given its analysis to that point, it "need[] not decide whether [the statute] leaves open adequate alternative channels for" the speech-related

activity at issue.  Id. (quoting Am. C.L. Union of Ill. v. Alvarez,
679 F.3d 583, 607 (7th Cir. 2012)).

**2.**

Project Veritas brought a similar though more expansive
First Amendment challenge to Section 99 on March 4, 2016 in the
same federal district as the Martin Plaintiffs.  The two suits
ultimately ended up before the same judge.  Martin, 340 F. Supp.
3d at 92-93.  Like the Martin Plaintiffs, Project Veritas brought
suit under 42 U.S.C. § 1983.  Project Veritas Action Fund v.
Conley, 244 F. Supp. 3d 256, 259 (D. Mass. 2017).

The Defendants moved to dismiss Project Veritas's
complaint for lack of subject matter jurisdiction under Federal
Rule of Civil Procedure 12(b)(1) and for failure to state a claim
under Federal Rule of Civil Procedure 12(b)(6).  The District Court
determined that it had jurisdiction under Article III of the United
States Constitution over Project Veritas's challenge to the
statute's prohibition on the secret recording of individuals who
lack a reasonable expectation of privacy and as to its challenge
to the statute in its entirety.  Id. at 262.  However, the District
Court concluded that Project Veritas's allegations that it wanted
to use secret recording to investigate government officials were
"too vague" to render ripe its pre-enforcement challenge to Section
99 insofar as it banned the secret, nonconsensual audio recording
of any such officials in public spaces, though it left Project

- 17 -

Veritas the opportunity "to replead[] more specific allegations."
Id.

      With that latter challenge to Section 99 out of the way
for the time being, the District Court took up the merits of
Project Veritas's claim that Section 99 violated the First
Amendment both "as-applied," insofar as the measure prohibited the
secret recording of private individuals who lacked an expectation
of privacy (though, apparently, even as to circumstances not
involving Project Veritas's own recording), and facially under the
First Amendment overbreadth doctrine as to the statute as a whole.
Id. at 262-66.  The District Court rejected both contentions.  Id.
at 265-66.

      With respect to what the District Court characterized as
Project Veritas's "as-applied" challenge -- which concerned
Section 99's ban on the secret, nonconsensual audio recording of
any person lacking a reasonable expectation of privacy in what was
recorded but not Section 99 as a whole -- it applied intermediate
scrutiny.  Id. at 262-63.  It then rejected this challenge on the
merits, because it concluded that Section 99's ban on such
recording "is narrowly tailored to serve the purpose of protecting
privacy by permitting only non-secret recordings of private
conversations," even though the statute banned secret recordings
in circumstances where the private speaker might not have a
reasonable expectation of privacy.  Id. at 265; see also id.

("While the reasonable expectation of privacy standard for defining oral communications might be the least restrictive alternative, that approach is not required under intermediate scrutiny when the privacy of individual conversations is at stake.").

There remained at that point only what the District Court characterized as Project Veritas's facial challenge to Section 99, which sought to invalidate the statute in its entirety under the First Amendment overbreadth doctrine. In addressing this challenge, the District Court observed that, under that doctrine, a plaintiff may bring a facial challenge to a statute -- under the First Amendment -- even "though its application in the case under consideration may be constitutionally unobjectionable." Id. (quoting Forsyth County v. Nationalist Movement, 505 U.S. 123, 129 (1992)). The District Court went on to hold, however, that Project Veritas's First Amendment overbreadth challenge failed because "[m]ost applications of Section 99 are constitutional," as "Section 99 constitutionally protects private conversations in all settings and conversations with government officials in nonpublic settings or about non-official matters." Id. at 266.

In the wake of the District Court's rulings, Project Veritas then filed an amended complaint on April 7, 2017. Following some further back and forth, it next filed a second amended complaint on September 29, 2017. In that complaint,

Project Veritas asserted that, but for Section 99, it would use or would have used secret recordings to:

- "investigate instances of landlords taking advantage of housing shortages in Boston where students may live in unsafe and dilapidated conditions, as well as the ties between these landlords and public officials";

- "investigate and report on the public controversy over 'sanctuary cities' in Massachusetts . . . by secretly investigating and recording interactions with government officials in Boston in the discharge of their duties in public places, including police officers, to learn more about their concerns about immigration policy and deportation"; and

- "investigate and record government officials who are discharging their duties at or around the State House in Boston and other public spaces to learn about their motives and concerns about immigration policy and deportation."

Project Veritas further alleged that, but for Section 99, its "journalists would have attended" "a large public event . . . in downtown Boston" on August 19, 2017, that involved "[i]ndividuals and organizations from other states tied to the ongoing PVA 'antifa' investigation," where they would have "secretly recorded public officials executing their duties as they

related to attendees."  At similar events in the future, the
complaint added, Project Veritas planned to "employ cellular phone
cameras and 'button cameras'" in order to "capture whether antifa
public events and protests are peaceful, whether police or other
public officials' interactions with antifa members are
non-violent, and otherwise capture the events to report to the
public."[1]

By the summer of 2018, discovery had been conducted and
Project Veritas, like the Martin Plaintiffs in their case, had
filed a motion for summary judgment.  On December 10, 2018, in the
same opinion in which the District Court granted summary judgment
to the Martin Plaintiffs, the District Court granted Project
Veritas's motion for summary judgment in part.  See Martin, 340 F.
Supp. 3d at 109.

The District Court concluded that Project Veritas had
standing to challenge Section 99's bar to the secret, nonconsensual
audio recording of any government official discharging official
duties in public spaces.  Id. at 104.  The District Court also

---

[1] Project Veritas's second amended complaint also
requested that the District Court hold that the statute was
constitutionally infirm insofar as it prohibited the secret,
nonconsensual recording of oral communications made by any person
speaking without a reasonable expectation of privacy.  It did not
make this request in its motion for summary judgment, however,
partially "in recognition of the fact that the [District] Court
ha[d] already dismissed [its] claims insofar as they pertain[ed]
to private individuals."  Martin, 340 F. Supp. 3d at 104 & n.5.

noted that "[t]he breadth of potential conduct" that Project
Veritas claimed it wanted to undertake in Massachusetts, "none of
which has actually occurred, creates serious ripeness concerns."
Id. But, the District Court concluded that it "need[ed] no
additional facts to resolve" the legal dispute over Project
Veritas's challenge to the statute's application to the secret,
nonconsensual audio recording of government officials performing
their duties in public places and thus that the claim was ripe.
Id. at 103.

Then, for largely the same reasons that led the District
Court to grant summary judgment to the Martin Plaintiffs on their
narrower-gauged First Amendment challenge to Section 99, it ruled
that Project Veritas's challenge to the statute -- insofar as it
applied to ban the secret, nonconsensual audio recording of any
government officials discharging their duties in public -- was
meritorious. Just like a ban on secretly recording the audio of
police officers without their consent while they are carrying out
their official duties in public places, the District Court
determined, a ban on such recording of government officials more
generally was subject to intermediate scrutiny and was not
"narrowly tailored to serve a significant government interest."
Id. at 106-07 (quoting Rideout v. Gardner, 838 F.3d 65, 72 (1st
Cir. 2016)). The District Court explained that this was so because
the statute's total ban on such recording went far beyond merely

protecting the "diminished privacy interests of government officials performing their duties in public."  Id. at 107.

**3.**

Following the District Court's summary judgment rulings in favor of the Martin Plaintiffs and Project Veritas, the parties participated in briefing regarding the injunction that the District Court would order.  But, on May 22, 2019, the District Court announced that it would not issue an injunction and that instead it would issue a declaratory judgment to the effect that Section 99 violated the First Amendment insofar as it barred the secret recording "of government officials, including law enforcement officers, performing their duties in public spaces." Martin v. Gross, 380 F. Supp. 3d 169, 173 (D. Mass. 2019).

The Defendants had requested that the District Court narrow or specify the meaning of "government officials" and "public space."  Id. at 172.  They also had asked the District Court to alter its ruling so that Section 99 could "still [be] enforceable where a surreptitious audio recording captures the oral communications of both a government official and a non-government official (i.e., a civilian)."  Id. at 173 (emphasis omitted).  But, the District Court declined to "reconsider" its approach at that "late stage in the proceedings."  Id.

The District Court explained, however, that it gave the terms "public space" and "government official" the same meaning

- 23 -

that it understood them to have in Glik, which addressed whether an individual had a First Amendment right to openly record the audio of police officers -- without their consent -- performing their duties in public. Martin, 380 F. Supp. 3d at 172-73 (discussing Glik, 655 F.3d at 82-85). In addition, the District Court noted that in Glik, this Court found that the plaintiff had a First Amendment right to record police officers discharging their duties in public without their consent, notwithstanding the fact that the plaintiff captured a private citizen -- namely, the individual the officers were arresting -- in the process. Id. at 173. The District Court consequently declined to narrow its declaratory judgment on that front, too. Id.

### 4.

The District Attorney filed timely notices of appeal in both cases. The BPD Commissioner did not appeal. Project Veritas filed its own timely notice of appeal from the District Court's decision dismissing its claims that challenged Section 99, both in its entirety under the First Amendment overbreadth doctrine and insofar as it banned the secret, nonconsensual recording of any oral communication made by any person without a reasonable expectation of privacy.

### II.

We begin with the District Attorney's appeal from the District Court's grant of summary judgment to the Martin

- 24 -

Plaintiffs.  The District Attorney contends that the District Court erred in its treatment of both jurisdiction and the merits.  We review the District Court's ruling granting summary judgment to the Martin Plaintiffs de novo in determining "if the record, viewed in the light most favorable to the nonmoving party" evinces "no genuine issue of material fact," such that "the moving party is entitled to a judgment as a matter of law."  Zabala-De Jesus v. Sanofi-Aventis P.R., Inc., 959 F.3d 423, 427-28 (1st Cir. 2020) (quoting Iverson v. City of Boston, 452 F.3d 94, 98 (1st Cir. 2006)).

**A.**

The District Attorney's jurisdictional objection concerns ripeness.  The ripeness inquiry is grounded in Article III's "prohibition against advisory opinions." Sindicato Puertorriqueño de Trabajadores v. Fortuño, 699 F.3d 1, 8 (1st Cir. 2012) (quoting Mangual v. Rotger-Sabat, 317 F.3d 45, 59 (1st Cir. 2003)).  The requirement's "basic rationale is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements."  Id. (quoting Abbott Lab'ys v. Gardner, 387 U.S. 136, 148 (1967)).

We have long used a "two-part test," derived from the Supreme Court's decision in Abbott Laboratories, to determine if a claim is ripe:

> First, the court must consider whether the
> issue presented is fit for review. This
> branch of the test typically involves
> subsidiary queries concerning finality,
> definiteness, and the extent to which
> resolution of the challenge depends upon facts
> that may not yet be sufficiently developed.
> The second branch of the Abbott Labs test
> requires the court to consider the extent to
> which hardship looms -- an inquiry that
> typically "turns upon whether the challenged
> action creates a 'direct and immediate'
> dilemma for the parties."

Ernst & Young v. Depositors Econ. Prot. Corp., 45 F.3d 530, 535

(1st Cir. 1995) (citation omitted) (quoting W.R. Grace & Co. v.

EPA, 959 F.2d 360, 364 (1st Cir. 1992)).

      "[W]hen free speech is at issue," however, "concerns

over chilling effect call for a relaxation of ripeness

requirements." Sullivan v. City of Augusta, 511 F.3d 16, 31 (1st

Cir. 2007). For that reason, "[a] party need not marshal all its

resources and march to the line of illegality to challenge a

statute on First Amendment grounds." Sindicato Puertorriqueño de

Trabajadores, 699 F.3d at 9. Still, "[t]o establish ripeness in

a pre-enforcement context, a party must have concrete plans to

engage immediately (or nearly so) in an arguably proscribed

activity. This gives a precise shape to disobedience, posing a

specific legal question fit for judicial review." R.I. Ass'n of

Realtors, Inc. v. Whitehouse, 199 F.3d 26, 33 (1st Cir. 1999).

      To frame the ripeness inquiry here, it helps to describe

the Martin Plaintiffs' challenge more precisely with respect to

where it falls along the facial/as-applied spectrum.  With their challenge so described, we then explain why we conclude that they have met their burden to satisfy both the fitness and hardship prongs under the ripeness inquiry.

**1.**

Whether a challenge is facial or as-applied can bear on whether it is ripe, see Kines v. Day, 754 F.2d 28, 30-31 (1st Cir. 1985), and so it is useful to address at the outset of our jurisdictional analysis the parties' dispute over the proper way to characterize the Martin Plaintiffs' First Amendment challenge. The dispute arises because the Martin Plaintiffs contend that they are bringing only "an as-applied claim," while the District Attorney contends that they are making a "facial" attack on Section 99.

This battle over labels is not fruitful.  The Martin Plaintiffs' challenge takes aim at only a portion of Section 99, but it seeks to block it in circumstances beyond the Martin Plaintiffs' own recording.  The challenge thus has both "as-applied" and "facial" characteristics.  There is no obvious sense in which one predominates.

Fortunately, the Supreme Court has confronted similar half-fish, half-fowl First Amendment challenges and instructed that where the challengers "do[] not seek to strike [a statute] in all its applications" but the relief sought "reach[es] beyond the

- 27 -

particular circumstances of [the] plaintiffs," they must "satisfy [the] standards for a facial challenge to the extent of that reach." John Doe No. 1 v. Reed, 561 U.S. 186, 194 (2010) (emphasis added); see also Showtime Ent., LLC v. Town of Mendon, 769 F.3d 61, 70 (1st Cir. 2014). We thus proceed on the understanding that the Martin Plaintiffs seek the invalidation -- facially -- of Section 99 but only insofar as it applies to bar the secret, nonconsensual audio recording of police officers discharging their official duties in public spaces.

We emphasize, though, that the Martin Plaintiffs contend that Section 99 is unconstitutional as applied to their own recording. In that respect, they are not bringing a First Amendment overbreadth challenge. Nor are they seeking, however, to invalidate the measure only insofar as it applies to their own conduct. They are bringing a challenge to a portion of Section 99 that they contend cannot be applied to bar such recording, whether undertaken by them or by anyone else, because it is not tailored in the way that they contend the First Amendment requires.

With the Martin Plaintiffs' challenge now better in view, we are well positioned to explain why we conclude that it is ripe. We begin with the question whether it is fit for adjudication in federal court. We then address whether the hardship prong of the ripeness inquiry has been met. In doing so, we are mindful of the Supreme Court's observation in Susan B.

Anthony List v. Driehaus, 573 U.S. 149 (2014), that the notion
that certain ripeness considerations are more prudential than
constitutional "is in some tension" with the Court's admonition
that "'a federal court's obligation to hear and decide' cases
within its jurisdiction 'is virtually unflagging.'"  Id. at 167
(quoting Lexmark Int'l, Inc. v. Static Control Components, Inc.,
572 U.S. 118, 125-26 (2014)).   But, because, as there, "the
'fitness' and 'hardship' factors are easily satisfied here," id.,
we conclude the claim is ripe for our adjudication.

**2.**

Starting with fitness, we discern no problematic
uncertainty as to the category of public officials whom the
plaintiffs wish to record.  Nor does the District Attorney suggest
that the group of public officials encompassed by the phrase
"police officers" is defined in terms that are too uncertain to
permit federal court review.

The District Attorney does argue that there is a
problematic degree of uncertainty as to the locations in which the
recording of police officers would occur, which the Martin
Plaintiffs identify as "public spaces."  But, we do not agree.
The Seventh Circuit in American Civil Liberties Union of
Illinois v. Alvarez held that a pre-enforcement First Amendment
challenge to a ban on the audio recording of police officers
discharging their duties in such places was justiciable.  679 F.3d

- 29 -

at 594.  Yet, the plaintiffs' recording plan there was not
materially more detailed in describing the locations in which the
recording would occur.  See id. at 593-94.

Indeed, the concern that "public spaces" is too
amorphous a category is mitigated here by the fact that we used
that same phrase in Glik and Gericke to describe the geographical
bounds of the citizen's right to record police officers that we
recognized there.  Glik, 655 F.3d at 84-85; Gericke, 753 F.3d at
8.  Our cases have fleshed out the contours of that category by
specifying that it includes traditional public fora, such as public
parks like the Boston Common (which was the site of the recording
in Glik, 655 F.3d at 84); the sites of traffic stops, including
those that occur on the sides of roads, see Gericke, 753 F.3d at
8 (recognizing the attempted recording of a traffic stop conducted
on a highway as falling within the First Amendment right to record
law enforcement discharging their duties in "public spaces"); and
other "inescapably" public spaces, id. at 7, such as the location
of the recording that occurred in Iacobucci v. Boulter, 193 F.3d
14 (1st Cir. 1999), which concerned a journalist's arrest for
openly recording members "of the Pembroke Historic District
Commission" that were having a conversation in "the hallway" of
the town hall immediately following an open public meeting, id. at
17-18.

- 30 -

Adding still further definition to the geographic scope of the recording plan is the fact that -- despite the District Attorney's contention to the contrary, see District Att'y's Br. at 39 -- we, like the District Court, see Martin, 380 F. Supp. 3d at 172-73, understand the Martin Plaintiffs to be using the phrase "public spaces" as Glik and Gericke did, and neither case, explicitly or implicitly, held that publicly accessible private property fell within the scope of "public spaces" for purposes of the right to record.

Finally, we discern no problematic uncertainty as to the nature of the police activities that the Martin Plaintiffs' challenge targets. Because the record suffices to show that the recording for which protection is sought is of police officers only in "public spaces," the range of police conduct at issue here is no mystery, just as it was not in Alvarez, given that the conduct consists only of the discharge of official functions. See 679 F.3d at 593-94.

The Martin Plaintiffs do seek protection for "secretly" rather than openly recording, however, and that does make their challenge different from the one involved in Alvarez. See id. at 607. But, that feature of their challenge does not create uncertainty as to whether Section 99 creates a risk that the Martin Plaintiffs would be prosecuted for engaging in such recording.

As we have explained, the SJC has construed Section 99 to encompass recording not conducted in "plain sight" of the person recorded, so long as that person has no actual knowledge it is occurring. See Hyde, 750 N.E.2d at 971. So, insofar as the record suffices to show that Section 99 is enforced, there is nothing about the nature of the recording of the kind in which the Martin Plaintiffs plan to engage that, legally, insulates it from such enforcement.

Nor does the fact that the recording will be carried out secretly make the range of police activities that, in principle, is subject to the recording different from the range of such activities that was at issue in Alvarez. Those activities -- as described by the Martin Plaintiffs -- are only ones that officers engage in while carrying out their official duties and then only while they are doing so in public spaces.

The District Attorney counters that precisely because the recording at issue will be conducted secretly, there is a "discrepancy . . . between the facts needed to adjudicate [the Martin Plaintiffs'] claim[] and the facts actually presented by [them]." As she sees it, courts have previously recognized "a right to openly record" police discharging official duties in public places but only in cases with well-developed factual records and, save for Alvarez, only ex post.

The District Attorney contends that a determination as to whether "a right to surreptitiously record" warrants the same protection as a right to record openly "is even more likely to depend on the factual circumstances surrounding the recording," in terms of where it occurs, whose audio is recorded, and how the fact of the recording is concealed. She asserts in this regard that the Martin Plaintiffs have "failed to present the kind of concrete facts about any prospective surreptitious recording [they] plan[] to make" that would make it possible for "a court to adjudicate their novel claims without resort to speculation, abstraction, and hypothetical facts." That the Martin Plaintiffs acknowledge that they may end up capturing the audio of private persons who interact with the police officers whom they record, the District Attorney suggests, exacerbates the concern.

It is true that, "[e]ven though a challenged statute is sure to work the injury alleged," there may be cases in which "adjudication might be postponed until 'a better factual record might be available.'" Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 300 (1979) (quoting Reg'l Rail Reorganization Act Cases, 419 U.S. 102, 143 (1974)). But, this case is not one of them.

We do not need a more fully developed record to assess the merits of the Martin Plaintiffs' purely legal assertion that, under our decisions in Glik and Gericke, a criminal statute can

- 33 -

constitutionally bar their planned First Amendment activity only if that activity would interfere with police officers performing their public duties or could be supported by a legitimate interest. Nor do we need additional factual development to be able to assess the purely legal question that concerns the level of scrutiny that applies to a ban on recording of this kind. See Susan B. Anthony List, 573 U.S. at 167 (finding that the challenge was ripe where it "present[ed] an issue that [was] 'purely legal, and [would] not be clarified by further factual development'" (quoting Thomas v. Union Carbide Agric. Prods. Co., 473 U.S. 568, 581 (1985))); Whitehouse, 199 F.3d at 34 (concluding that the claim was ripe because it presented a "single, purely legal question"); see also Commodity Trend Serv. v. Commodity Futures Trading Comm'n, 149 F.3d 679, 687 n.3 (7th Cir. 1998) ("[A] facial constitutional challenge presents only a legal issue -- the quintessentially 'fit' issue for present judicial resolution . . . .").

There also is no need for additional factual development for us to be able to assess the merits of the Martin Plaintiffs' assertion that the categorical prohibition that Section 99 places on the recording for which they seek protection is, on its face, too uncalibrated to survive such First Amendment review. We may assess that contention on this record, taking due account of both the fact that third parties may be recorded and that secret recording can take many forms. For while those features bear on

the merits of the Martin Plaintiffs' challenge, they do not render
the contention that the ban at issue is overly broad unfit for
resolution in federal court.

Indeed, insofar as the District Attorney posits that the
way to develop a better record would be for the Martin Plaintiffs
to first violate the statute, the suggested approach is itself
problematic. It runs headlong into the Supreme Court's consistent
admonition that we avoid putting First Amendment plaintiffs to the
stark choice of having their speech chilled or committing a crime.
See, e.g., Babbitt, 442 U.S. at 298 ("When the plaintiff has
alleged an intention to engage in a course of conduct arguably
affected with a constitutional interest, but proscribed by a
statute, and there exists a credible threat of prosecution
thereunder, he 'should not be required to await and undergo a
criminal prosecution as the sole means of seeking relief.'"
(quoting Doe v. Bolton, 410 U.S. 179, 188 (1973))); Dombrowski v.
Pfister, 380 U.S. 479, 486 (1965) ("Because of the sensitive nature
of constitutionally protected expression, we have not required
that all of those subject to overbroad regulations risk prosecution
to test their rights.").

### 3.

If we shift our focus to the hardship prong of the
ripeness inquiry, we also see no reason to conclude that there is
a ripeness problem. Section 99 plainly makes it a crime to engage

- 35 -

in the type of recording that the Martin Plaintiffs seek to
undertake. In fact, the District Attorney does not dispute that
point. Nor has the District Attorney "convincingly demonstrate[d]
that the statute is moribund or that it simply will not be
enforced." N.H. Right to Life Pol. Action Comm. v. Gardner, 99
F.3d 8, 16 (1st Cir. 1996). Indeed, Section 99 has been enforced
in the not-too-distant past. Martin, 340 F. Supp. 3d at 93-94.
Thus, the Martin Plaintiffs have met their burden at this stage of
the proceedings to establish that it is "highly probable that
[they] will at some point find [themselves] either in violation
of" Section 99 "or be forced to self-censor." N.H. Right to Life
Pol. Action Comm., 99 F.3d at 16; see also Alvarez, 679 F.3d at
588, 592 (finding no Article III bar where the plaintiff explained
that "because of a credible fear of prosecution, it ha[d] not
followed through on its [recording] program," where the "statute
plainly prohibit[ed] the [plaintiffs'] proposed audio recording,"
and where "[t]he statute [had] not fallen into disuse").

**4.**

The District Attorney does point to various precedents
that she contends demonstrate that the Martin Plaintiffs'
challenge is too unformed to satisfy either the fitness or the
hardship prongs of the ripeness inquiry. But, those authorities,
if anything, suggest the opposite.

The District Attorney first points to the portion of
Babbitt in which the Supreme Court found a First Amendment
challenge to a state law denying labor organizers access to
farmworkers on privately owned property not ripe because the
challenge "depend[ed] inextricably upon the attributes of the
situs involved."  442 U.S. at 304.  But, while the District
Attorney contends the same is the case here, the Court was
concerned there that only certain privately owned places to which
the plaintiffs might be denied access would be sufficiently
analogous to the company town in Marsh v. Alabama, 326 U.S. 501
(1946), to trigger First Amendment constraints at all.  Babbitt,
442 U.S. at 304.  Here, by contrast, the Martin Plaintiffs seek to
engage in recording only in those "public spaces" that we have
identified as ones in which First Amendment constraints were
triggered.  See Gericke, 753 F.3d at 8-9; Glik, 655 F.3d at 82.

The District Attorney's reliance on Renne v. Geary, 501
U.S. 312 (1991), is also misplaced.  In that case, the ripeness
problem arose from the fact that there was "no factual record of
an actual or imminent application" of the challenged state law
measure against the plaintiffs.  Id. at 321-22.  But, no similar
reason for concern exists in this case, given the record of past
enforcement of Section 99.

Finally, the District Attorney relies on Kines v. Day,
which concerned an inmate's First Amendment challenge to a prison

regulation restricting his access to certain publications. 754
F.2d at 29. But, although we found that his challenge as to how
that regulation might actually be applied to him in some
unspecified future circumstance was not ripe, we addressed his
facial challenge to that rule without questioning that it was
properly subject to our review of the merits. See id. at 29-31.
Thus, Kines offers no support to the District Attorney, as the
Martin Plaintiffs' challenge more closely resembles the facial
challenge in Kines that we addressed on the merits than the as-
applied challenge that we held to be unripe in that case. See
also Reed, 561 U.S. at 194 (explaining that a claim can have
"characteristics" of both a facial and an as-applied challenge but
that it is the "relief that would follow" and not the "label" that
"matters"); see also supra Section II.A.1.

**5.**

For these reasons, the District Court correctly ruled
that the Martin Plaintiffs' pre-enforcement challenge satisfies
both the "fitness" and "hardship" prongs of the test for ripeness
under Abbott Laboratories, 387 U.S. at 148-49, and therefore
necessarily meets the demands of Article III with respect to
ripeness. See Alvarez, 679 F.3d at 594 ("So long as th[e]
uncertainty does not undermine the credible threat of prosecution
or the ability of the court to evaluate the merits of the

- 38 -

plaintiff's claim in a preenforcement posture, there is no reason to doubt standing.").

B.

We move on, then, to the merits. In taking them up, we first need to address whether the recording at issue -- secretly conducted though it is -- warrants at least some degree of First Amendment protection. Because we conclude that it does, we next need to explicate the level of First Amendment scrutiny that Section 99's ban on that recording warrants. With that analytical foundation in place, we then explain why we conclude that, given the breadth of the measure's prohibition on that kind of recording, it cannot survive the degree of scrutiny that we conclude we must apply.

1.

The Martin Plaintiffs challenge a restriction on their right to collect information rather than on their right to publish information that has been lawfully collected. But, the First Amendment limits the government regulation of information collection, as our decisions in Glik and Gericke show. See also Branzburg v. Hayes, 408 U.S. 665, 681 (1972) ("[W]ithout some protection for seeking out the news, freedom of the press could be eviscerated."). In fact, as we next explain, those decisions show that the First Amendment imposes at least some restrictions on the government's authority to bar the audio recording of police

- 39 -

officers while they are discharging their official duties in public spaces.

As we explained in Glik, the First Amendment's protection "encompasses a range of conduct related to the gathering and dissemination of information." 655 F.3d at 82. That is so, Glik elaborated, because "[g]athering information about government officials in a form that can readily be disseminated to others serves a cardinal First Amendment interest in protecting and promoting 'the free discussion of governmental affairs.'" Id. (quoting Mills v. Alabama, 384 U.S. 214, 218 (1966)).

In recognizing the "particular significance" of First Amendment newsgathering rights "with respect to government," moreover, Glik noted that "the state has a special incentive to repress opposition and often wields a more effective power of suppression." Id. (quoting First Nat'l Bank v. Bellotti, 435 U.S. 765, 777 n.11 (1978)). Glik explained in this regard that protecting the right to collect information about government officials "not only aids in the uncovering of abuses, but also may have a salutary effect on the functioning of government more generally." Id. at 82-83 (citation omitted). Glik added that the justifications for protecting newsgathering were "particularly true" when it came to collecting information about "law enforcement officials." Id. at 82.

Based on these observations, Glik held the following.
It ruled that the federal constitutional guarantee of freedom of
speech protects the right to record "government officials,
including law enforcement officers, in the discharge of their
duties in a public space," id. at 85, even when the recording,
which there involved both audio and video, is undertaken without
the consent of the person recorded, id. at 80.

Gericke then went on to extend Glik. See Gericke, 753
F.3d at 7-8. There, the person attempting to record both audio
and video was an individual whom the police had pulled over during
a traffic stop, id. at 7, and thus, unlike in Glik, she was not a
mere observer to the police encounter that was recorded but a
participant in it. Further distinguishing the case from Glik, the
recording at issue in Gericke attempted to capture an encounter
that occurred on the side of a highway rather than in a public
park. Id. at 3-4. But, even though the recording was attempted
by a person the police had stopped in a location that was hardly
a traditional site for First Amendment expression, Gericke held
based on Glik that the recording at issue warranted First Amendment
protection, at least to some extent. Id. at 7. Indeed, Gericke
reaffirmed Glik's broad formulation of the kind of recording that
constituted newsgathering and found that it encompassed the
attempted recording there. Id. at 7-9.

Notably, Glik and Gericke accord with the decisions of
several of our sister circuits that similarly have held that such
recording warrants some degree of First Amendment protection as a
type of newsgathering. See, e.g., Alvarez, 679 F.3d at 600
(finding that the challenged eavesdropping statute "burdens speech
and press rights" because it "interferes with the gathering and
dissemination of information about government officials performing
their duties in public"); Fields v. City of Philadelphia, 862 F.3d
353, 359 (3d Cir. 2017) ("[R]ecording police activity in public
falls squarely within the First Amendment right of access to
information."); Smith v. City of Cumming, 212 F.3d 1332, 1333 (11th
Cir. 2000) (recognizing the First Amendment "right to gather
information about what public officials do on public property" and
"to record matters of public interest"); Fordyce v. City of
Seattle, 55 F.3d 436, 442 (9th Cir. 1995) (finding a genuine
dispute of material fact as to whether officers had interfered
with the plaintiff's "First Amendment right to gather news"). And,
while some courts of appeals have held that this right to record
is not clearly established in some contexts for purposes of
qualified immunity, see, e.g., Kelly v. Borough of Carlisle, 622
F.3d 248, 263 (3d Cir. 2010), none has held that the right does
not exist.

It is true that these other cases -- like Glik and
Gericke themselves -- concerned the open rather than the secret,

nonconsensual recording of police officers.  But, Glik described the scope of the recording activity that triggers First Amendment protection as a type of newsgathering capaciously as recording "government officials, including law enforcement officers, in the discharge of their duties in a public space."  655 F.3d at 85. Gericke then went on to use that same broad formulation, 753 F.3d at 9, which does not exempt secret recording.

The logic that Glik and Gericke relied on in setting forth that encompassing description of First Amendment-protected recording of police supplies strong support for understanding it to encompass recording even when it is conducted "secretly," at least as Section 99 uses that term.  To understand why, one need only consider the Hyde dissent's example of the recording of the beating of Rodney King.

Like the many recordings of police misconduct that have followed, the recording in the King case was made from a location unlikely to permit it to qualify as recording conducted in "plain sight" of those recorded, just as the dissent in Hyde emphasized. But, as recent events around the nation vividly illustrate, such undetected recording can itself serve "a cardinal First Amendment interest in protecting and promoting 'the free discussion of governmental affairs,'" and "not only aids in the uncovering of abuses . . . but also may have a salutary effect on the functioning of government more generally."  Glik, 655 F.3d at 82-83 (quoting

Mills, 384 U.S. at 218); cf. Fields, 862 F.3d at 359 ("Civilian video . . . fills the gaps created when police choose not to record video or withhold their footage from the public.").

In fact, as the Martin Plaintiffs point out, audio recording of that sort can sometimes be a better tool for "[g]athering information about" police officers conducting their official duties in public, and thereby facilitating "the free discussion of governmental affairs" and "uncovering . . . abuses," than open recording is. See Glik, 655 F.3d at 82 (quoting Mills, 384 U.S. at 218). That is not only because recording undertaken from a distance -- and thus out of plain sight of the person recorded -- will often be the least likely to disrupt the police in carrying out their functions. It is also because recording that is not conducted with the actual knowledge of the police officer -- even if conducted proximate to the person recorded -- may best ensure that it occurs at all, given the allegations that the Martin Plaintiffs set forth about the resistance from official quarters that open recording sometimes generates.

In sum, a citizen's audio recording of on-duty police officers' treatment of civilians in public spaces while carrying out their official duties, even when conducted without an officer's knowledge, can constitute newsgathering every bit as much as a credentialed reporter's after-the-fact efforts to ascertain what had transpired. The circumstances in which such recording could

be conducted from a distance or without the officers' knowledge and serve the very same interest in promoting public awareness of the conduct of law enforcement -- with all the accountability that the provision of such information promotes -- are too numerous to permit the conclusion that recording can be prohibited in all of those situations without attracting any First Amendment review. We thus hold that the Martin Plaintiffs' proposed recording constitutes a type of newsgathering that falls within the scope of the First Amendment, even though it will be undertaken secretly within the meaning of Section 99.[2]

**2.**

That such recording qualifies as a species of protected newsgathering does not mean that Section 99's criminal bar against it necessarily violates the First Amendment. We cautioned in Glik that the right to record that was recognized there "is not without limitations." Id. at 84. We thus must determine whether the "limitations" that Section 99 imposes on this type of recording -- conducted secretly as it will be -- comport with the First Amendment.

Glik had "no occasion to explore those limitations" because the audio recording of the officers at issue there occurred

---

[2] We thus need not and do not address here the possible bounds of this right, such as whether it includes recording via deceptive tactics that would affirmatively mislead officers into incorrectly thinking that they are not being recorded.

"peaceful[ly]," from a "comfortable" distance, in a "public
space," and in a manner that did "not interfere with the police
officers' performance of their duties." Id. But, although Glik
made clear that such peaceable open recording -- which captured an
"arrest on the Boston Common" -- was "worlds apart" from the
recording of a "traffic stop," id. at 85, Gericke explained that
the distinct concerns about public safety and interference with
official duties implicated by such a stop did not, without more,
"extinguish" the right we recognized in Glik. Gericke, 753 F.3d
at 7 (discussing Glik, 655 F.3d at 82-83). In fact, although
Gericke recognized that the circumstances of a given police
encounter "might justify a safety measure" that could incidentally
constrain citizens' right to record, it held that "a police order
that is specifically directed at the First Amendment right to
[record] police performing their duties in public may be
constitutionally imposed only if the officer can reasonably
conclude that the [recording] itself is interfering, or is about
to interfere, with his duties." Id. at 8.

Gericke did recognize that the government might choose
to regulate such recording in a more general, ex ante manner. But,
it concluded that the government would need a "legitimate
governmental purpose" to impose a limitation of that sort. Id.
Thus, in light of Glik and Gericke, we must decide whether either
the Commonwealth's interest in prohibiting conduct that

"interfere[s]" with police officers' ability to carry out their duties or some other "legitimate governmental purpose" justifies Section 99's ban on the secret, nonconsensual audio recording of police officers discharging their official duties in public spaces.  Id.; see also Glik, 655 F.3d at 84.

Before answering that question, though, we must decide how tailored Section 99's ban on the recording here needs to be to the legitimate governmental interest that the Commonwealth claims Section 99's criminal bar against the recording at issue serves, whether it is the interest in preventing interference with the discharge of police functions or some other interest altogether. We thus turn to that antecedent question, which sounds in the familiar vernacular of "level of scrutiny."

### a.

The District Court agreed with the Martin Plaintiffs that Section 99's ban is content neutral, because it prohibits secret recording without regard to the topics or ideas recorded. Martin, 340 F. Supp. 3d at 105; see also Jean, 492 F.3d at 29 ("[S]ection 99 is a 'content-neutral law of general applicability.'" (quoting Bartnicki v. Vopper, 532 U.S. 514, 526 (2001))).  Accordingly, the District Court also agreed with the Martin Plaintiffs that strict scrutiny would not be appropriate. Martin, 340 F. Supp. 3d at 105.

The District Court expressly pointed out, however, that the Defendants did not develop an argument that "a standard lower than intermediate scrutiny" should be applied, as they merely suggested that such a lower standard "might" be appropriate. Id. at 106. Thus, the District Court accepted the Martin Plaintiffs' argument that Section 99's bar on the secret recording at issue should be evaluated under "intermediate scrutiny," id. at 105, which required the District Court to determine whether the bar is "narrowly tailored to serve a significant government interest," id. at 106 (quoting Rideout, 838 F.3d at 71–72). The District Court also noted that for a law to survive intermediate scrutiny, it "must 'leave open ample alternative channels for communication.'" Id. (quoting Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989)).

On appeal, the District Attorney challenges the District Court's decision to apply that level of scrutiny by referencing precedents applying forum analysis to evaluate restrictions on expression. She notes that the category "public spaces" encompasses not only traditional public fora like public parks but also limited and nonpublic fora, such as the shoulders of highways and certain areas of public buildings like the site of the recording at issue in Iacobucci, 193 F.3d at 18. But, she points out, the intermediate level of scrutiny that applies to content-neutral restrictions on expression in traditional public fora, see

Cutting v. City of Portland, 802 F.3d 79, 84 (1st Cir. 2015)
(applying intermediate scrutiny), gives way to a lower level of
scrutiny when we evaluate such restrictions in other fora, see Am.
Freedom Def. Initiative v. Mass. Bay Transp. Auth., 781 F.3d 571,
581 (1st Cir. 2015) (asking as to nonpublic fora whether the
restrictions "are not viewpoint-based and are reasonable in light
of the purposes for which the forum was established"). For that
reason, the District Attorney contends, the District Court erred
in applying intermediate scrutiny to Section 99's bar across the
board, as by doing so the District Court failed to attend to the
differing locales in which the planned recording would occur and
thus required the government to satisfy a degree of fit between
means and ends that was unnecessarily demanding.

Neither Glik nor Gericke, however, purported to
predicate the level of scrutiny that applied to the challenged
recording restrictions on forum analysis. And while the Supreme
Court has not addressed a challenge to a prohibition against
secretly (or, for that matter, openly) recording law enforcement,
there is no indication in its precedent that the "forum based"
approach that is used to evaluate a "regulation of speech on
government property," Int'l Soc'y for Krishna Consciousness v.
Lee, 505 U.S. 672, 678 (1992) (emphasis added), necessarily applies
to a regulation on the collection of information on public
property, see United States v. Am. Libr. Ass'n, 539 U.S. 194, 205

(2003) (plurality opinion) ("[P]ublic forum principles . . . are
out of place in the context of this case."); see also id. ("We
expressly declined to apply forum analysis [in National Endowment
for the Arts v. Finley, 524 U.S. 569 (1998)]."); Legal Servs. Corp.
v. Velazquez, 531 U.S. 533, 544 (2001) (noting that the Court's
limited forum cases were related to but did not control its subsidy
cases). Compare March v. Mills, 867 F.3d 46, 53-54 (1st Cir. 2017)
(applying forum analysis to a statute that "restrict[ed]
noisemaking even in public parks . . . [and] other traditional
public fora"), with Pleasant Grove City v. Summum, 555 U.S. 460,
480 (2009) ("[A]s a general matter, forum analysis simply does not
apply to the installation of permanent monuments on public
property."). Nor does the District Attorney offer anything beyond
assertion as to why forum analysis -- in a strict sense -- applies
in the context of the right to engage in the newsgathering involved
here.

The application of intermediate scrutiny also accords
with the approach that we took in Glik and Gericke, even though
neither case explicitly named the level of scrutiny deployed.
Indeed, the District Attorney -- by repeatedly emphasizing that
the facts underlying Glik took place in a traditional public forum
and by conceding that intermediate scrutiny pertains in such a
setting -- implicitly recognizes that we effectively applied that
level of scrutiny in Glik. See Glik, 655 F.3d at 84 (recognizing

- 50 -

that the right to record may be subject to appropriate time, place, and manner restrictions); see also, e.g., Rideout, 838 F.3d at 71-72 (citing Ward, 491 U.S. at 791, a case about time, place, or manner restrictions, in articulating the inquiry for intermediate scrutiny); McGuire v. Reilly, 260 F.3d 36, 43 (1st Cir. 2001) (describing the "level of analysis" that applies to "time, place, and manner" restrictions as "intermediate scrutiny"). And, while Gericke was no more express than Glik in naming the level of scrutiny applied, it purported only to be following Glik, despite the fact that the recording there did not occur in a traditional public forum.

Finally, the intermediate level of scrutiny the District Court applied roughly tracks the scrutiny applied to restrictions on newsgathering in other locales to which the public generally has access to collect information. This correspondence reinforces our conclusion that we have no reason to depart from the District Court's approach here. See Press-Enter. Co. v. Superior Ct., 478 U.S. 1, 13-14 (1986) (holding that a criminal proceeding may be closed to protect the accused's right to a fair trial only if doing so is "narrowly tailored to serve that interest," meaning that "there is a substantial probability that the defendant's right to a fair trial will be prejudiced by publicity that closure would prevent" and that "reasonable alternatives to closure cannot adequately protect the defendant's fair trial rights" (quoting

Press-Enter. Co. v. Superior Ct., 464 U.S. 501, 510 (1984))); see also Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 580-81 (1980) (plurality opinion); United States v. Three Juveniles, 61 F.3d 86, 88 (1st Cir. 1995).

### b.

We have, then, but one task left to complete:  We need to review the District Court's application of intermediate scrutiny to the bar that Section 99 imposes, which in turn requires us to evaluate each of the Commonwealth's purported interests in enacting the ban on the type of recording in which the Martin Plaintiffs plan to engage and the extent to which Section 99 furthers those interests.[3]  As we will explain, we conclude that the District Court rightly determined that, even though intermediate scrutiny does not require that a measure be the least restrictive means of achieving the government's interests, Section 99 is not narrowly tailored to further either of the identified governmental interests -- namely, preventing interference with police activities and protecting individual privacy -- notwithstanding their importance.  See Martin, 340 F. Supp. 3d at 106-08.

---

[3] We note also that at least one other circuit has suggested that restrictions on open recording in public places should be subject to intermediate scrutiny.  See Alvarez, 679 F.3d at 604.

i.

The government is under no obligation to permit a type of newsgathering that would interfere with police officers' ability to do their jobs. But, neither Glik nor Gericke accepted the notion that the mere act of open recording, without more, so severely disrupted officers in carrying out their duties that it justified the restriction of such recording in the absence of the consent of all recorded persons. Those cases in this respect establish, at the least, that the police's own view of whether recording of their work is desirable is not the measure of whether it causes interference that would justify its total prohibition.

Because the recording here will not be done in plain sight or with the actual knowledge of the officers whose words will be recorded, they will not even be aware that such recording is occurring. For that reason, they will not be on specific notice of a need to take precautions to ensure that words that they do not wish to have recorded are not. But, insofar as the mere prospect of being recorded leads officers to feel the need to refrain from uttering words or engaging in actions that would constitute misconduct, it hardly interferes with their capacity to perform their official duties. Nor does the record show how heightened consciousness on the officers' part that recording may be occurring, even if the officers are not on specific notice that it actually is, would appreciably alter their ability to protect

the public either in gross or at the retail level of more
individualized interactions.

It was suggested at oral argument that officers seeking
to converse with confidential informants could be constrained in
their ability to do so, in light of the possibility that any such
exchange would be recorded by an unknown and unseen observer. <u>See</u>
<u>also Alvarez</u>, 679 F.3d at 613 (Posner, J., dissenting). But, we
presume officers are already careful when engaging in such
sensitive conversations within earshot of others, and the record
offers no other details about how any such heightened caution might
disrupt police practice. Thus, the record provides no support for
the conclusion that Section 99 reduces interference with official
police responsibilities in any meaningful way with respect to at
least the mine-run of circumstances -- whether involving an arrest
in a park, a roadside traffic stop, or a gathering in a foyer
following a public meeting in a public building -- in which police
officers may be "secretly" recorded without their consent while
discharging their official functions in public spaces. <u>See</u>
<u>Gericke</u>, 753 F.3d at 8; <u>cf.</u> <u>City of Houston</u> v. <u>Hill</u>, 482 U.S. 451,
463 n.11 (1987) (explaining that true "physical obstruction of
police action" may "constitutionally be punished under a properly
tailored statute" but that such an objective cannot be accomplished
by "broadly criminalizing" First Amendment activity directed
toward an officer).

Accordingly, we conclude that the statute's outright ban on such secret recording is not narrowly tailored to further the government's important interest in preventing interference with police doing their jobs and thereby protecting the public. See Rideout, 838 F.3d at 72; see also Turner Broad. Sys., Inc. v. FCC, 512 U.S. 622, 664 (1994) (plurality opinion) (explaining that even where the government's asserted interests are important it still "must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way"); City of Los Angeles v. Preferred Commc'ns, Inc., 476 U.S. 488, 496 (1986) (advising that courts should not "simply assume" that a statute "will always advance the asserted state interests sufficiently" (quoting Members of City Council v. Taxpayers for Vincent, 466 U.S. 789, 803 n.22 (1984))). Rather, despite a record that does little to show how secret, nonconsensual audio recording of police officers doing their jobs in public interferes with their mission, Section 99 broadly prohibits such recording, notwithstanding the myriad circumstances in which it may play a critical role in informing the public about how the police are conducting themselves, whether by documenting their heroism, dispelling claims of their misconduct, or facilitating the public's ability to hold them to account for their wrongdoing.

**ii.**

There remains the question whether Section 99's prohibition against the recording at issue is nevertheless properly calibrated to serve some other "legitimate governmental purpose." Gericke, 753 F.3d at 8.  The District Attorney contends that it is, because although Massachusetts "values public scrutiny of government affairs, including that accomplished through recordings," it has a "significant interest" in "assur[ing] that its citizens are aware of when they are being recorded, safeguarding a specific type of privacy -- not freedom from being recorded, but rather notice of being recorded."  The District Attorney also presses the related contention that protecting such a privacy interest helps ensure "the vibrancy of [] public spaces and the quality of the discourse that occurs there" by allowing speakers to take comfort in the fact that they will not be unwittingly recorded.

Protecting the privacy of the citizens of Massachusetts is a legitimate and important governmental interest.  See Bartnicki, 532 U.S. at 532-33.  But, as we noted in Glik, "[i]n our society, police officers are expected to endure significant burdens caused by citizens' exercise of their First Amendment rights."  655 F.3d at 84; see also City of Houston, 482 U.S. at 462-63 ("The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the

principal characteristics by which we distinguish a free nation from a police state."). That includes the loss of some measure of their privacy when doing their work in public spaces. See Gertz v. Robert Welch, Inc., 418 U.S. 323, 344 (1974) ("An individual who decides to seek governmental office . . . runs the risk of closer public scrutiny than might otherwise be the case. And society's interest in the officers of government is not strictly limited to the formal discharge of official duties."); Jean, 492 F.3d at 30 (finding police officers' privacy interests "virtually irrelevant" where they were recorded searching a private home). Thus, even if there might be circumstances in which officers -- while in public spaces and working -- have some privacy interest that the prospect of secret recording could threaten, the total ban on all such audio recording of any of their official activities in public spaces simply because it qualifies as being done "secretly" within the meaning of Hyde is too unqualified to be justified in the name of protecting that degree of privacy.

Rather than dispute this point, the District Attorney focuses on the fact that private citizens in the vicinity of the officers are not themselves governmental employees, let alone law enforcement officers on the job. She argues that "[c]ivilians have many reasons to voluntarily interact" with government officials, including police officers, in public and that even civilians who have no intention of interacting with police "might

simply be within audible recording range." Yet, the District Attorney notes, their words may be picked up by the recording that the Martin Plaintiffs contend they have a First Amendment right to undertake without those persons having any notice that recording is taking place.

In pressing this point, the District Attorney contends that special attention must be paid to the fact that "when a recording is made surreptitiously, the person being recorded unwittingly becomes a captive." She supports this argument by invoking the Supreme Court's captive-audience cases. See, e.g., Hill v. Colorado, 530 U.S. 703, 716-17 (2000); Rowan v. U.S. Post Off. Dep't, 397 U.S. 728, 738 (1970).

In that line of cases, the Court recognized that government can protect an "interest" in "avoid[ing] unwelcome speech" if "the degree of captivity makes it impractical for the unwilling viewer or auditor to avoid exposure." Hill, 530 U.S. at 717-18 & n.24 (quoting Erzoznik v. Jacksonville, 422 U.S. 205, 209 (1975)). The District Attorney argues that the recording of an unwitting private citizen is tantamount to rendering that person a captive because "that person is unaware of the recording, and thus is deprived of any meaningful opportunity to do anything about it."

But, the captive-audience line of authority concerns restrictions on expression that the government may impose to

protect persons from being subjected to speech they wish to avoid.
The risk of being subjected to unwanted speech, of course, is not
a concern here. Moreover, the only individuals who will be
recorded by the Martin Plaintiffs are those in public spaces who
are within earshot of police officers and choose to speak. Thus,
we do not see how -- across the board -- the proposed secret
recording results in "substantial privacy interests . . . being
invaded in an essentially intolerable manner." Cohen v.
California, 403 U.S. 15, 21 (1971). For similar reasons, we are
not persuaded by the District Attorney's reliance on Bartnicki v.
Vopper, 532 U.S. at 517, 533. The differences between the
circumstances of the telephone conversation recorded there and
those in which the recording would occur under the Martin
Plaintiffs' desired rule, which pertains only to a far more public
setting, are too great to make the analogy a persuasive one.

We can envision circumstances in which an individual who
is interacting with (or in the vicinity of) a police officer might
have a particularly heightened reason to wish to have notice that
her comments are being recorded. Cf. Fla. Star v. B.J.F., 491
U.S. 524, 537 (1989) (recognizing a privacy interest in the
identity of rape victims); United States v. Cotto-Flores, 970 F.3d
17, 38 (1st Cir. 2020) (recognizing a compelling interest in
"protecting 'minor victims of sex crimes from further trauma and
embarrassment'" (quoting Maryland v. Craig, 497 U.S. 836, 852

(1990))); United States v. Tse, 375 F.3d 148, 164 (1st Cir. 2004)
(recognizing the "important concern[]" of preventing unnecessary
embarrassment to witnesses).  But see Branzburg, 408 U.S. at 693
(minimizing the interest of newspaper informants who wish to remain
anonymous where "[t]hey may fear that disclosure will threaten
their job security or personal safety or that it will simply result
in dishonor or embarrassment"); see Alvarez, 679 F.3d at 611
(Posner, J., dissenting) (cataloging examples of interactions that
an officer may have with private citizens in public).  Notice of
recording may help such private individuals avoid the shame or
embarrassment of the recording of their unfiltered comments or
help prevent their statements from being taken out of context.
See 1968 Commission Report at 12 (expressing an interest in
protecting "the person who chooses to speak frankly and freely in
personal conversation" from the exposure of "what he says in jest,
with a wink, for its shock value on his conversational partner, or
to test some belief held by the other party").  But, as a general
matter, an individual's privacy interests are hardly at their
zenith in speaking audibly in a public space within earshot of a
police officer.  Cf. Cox Broad. Corp. v. Cohn, 420 U.S. 469, 494-
95 (1975).  Thus, we conclude that Massachusetts may not deploy
the blunderbuss prohibitory approach embodied in Section 99 to
protect civilians in the core set of situations where their privacy
interests may be heightened.  See Ward, 491 U.S. at 799

("Government may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals."); Frisby v. Schultz, 487 U.S. 474, 485 (1988) ("A complete ban can be narrowly tailored, but only if each activity within the proscription's scope is an appropriately targeted evil."); Cutting, 802 F.3d at 86 ("[B]y demanding a close fit between ends and means, the tailoring requirement prevents the government from too readily sacrificing speech for efficiency." (quoting McCullen v. Coakley, 573 U.S. 464, 486 (2014))); cf. Fla. Star, 491 U.S. at 539 ("We have previously noted the impermissibility of categorical prohibitions upon media access where important First Amendment interests are at stake.").

In light of our analysis to this point, we need not address whether the statute leaves open viable alternative channels for First Amendment activity. See Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Village of Stratton, 536 U.S. 150, 168-69 (2002) (striking down an ordinance on tailoring grounds without reaching whether alternative channels of communication were sufficient). We are not persuaded, however, by the District Attorney's assertion that Section 99 "preserves adequate alternative channels" because it "does not limit open recording in any way." "[A]udio and audiovisual recording are uniquely reliable and powerful methods of preserving and disseminating news and information about events that occur in public," Alvarez, 679 F.3d

at 607, and the undisputed record supports the Martin Plaintiffs'
concern that open recording puts them at risk of physical harm and
retaliation and thereby undermines its capacity to serve as an
adequate alternative means of newsgathering if the type of
recording at issue here is barred.

### c.

We thus conclude that Section 99, which does not contain
the privacy-based exceptions other states recognize in their
recording bans, see, e.g., Fla. Stat. § 934.02(2), is
insufficiently tailored to serve the important privacy interests
implicated in the context of the Martin Plaintiffs' challenge.[4]
Accordingly, we affirm the District Court's grant of summary
judgment to the Martin Plaintiffs.

### III.

We now turn to the cross-appeals that stem from Project
Veritas's suit challenging Section 99 on First Amendment grounds.
We first consider Project Veritas's appeal from the District
Court's grant of the Defendants' motion to dismiss its claim that
Section 99 is invalid in its entirety under the First Amendment's

---

[4] The District Attorney also "observes," in a footnote,
that Section 99 "might alternatively be analyzed as a regulation
of conduct that imposes a mere incidental burden on expression."
But, the argument is waived for insufficient development. Doe v.
Trs. of Bos. Coll., 892 F.3d 67, 83 n.7 (1st Cir. 2018) (quoting
Nat'l Foreign Trade Council v. Natsios, 181 F.3d 38, 60 n.17 (1st
Cir. 1999)).

overbreadth doctrine.    We then consider its challenge to the District Court's grant of the Defendants' motion to dismiss its claim that Section 99 is unconstitutional insofar as it prohibits the secret recording of private individuals whenever they have no expectation of privacy.    Finally, we take up the District Attorney's appeal from the District Court's decision to grant summary judgment to Project Veritas on its claim that this measure violates the First Amendment insofar as it prohibits the secret, nonconsensual audio recording of all government officials performing their duties in public spaces.    The District Attorney challenges that ruling both on jurisdictional grounds and on the merits.    Our review of these challenges -- whether brought by Project Veritas or the District Attorney -- is de novo.    <u>Zabala-De Jesus</u>, 959 F.3d at 427; <u>Lyman</u> v. <u>Baker</u>, 954 F.3d 351, 359 (1st Cir. 2020).

### A.

The District Court implicitly ruled that Project Veritas's facial overbreadth claim was ripe, <u>Project Veritas Action Fund</u>, 244 F. Supp. 3d at 262, 265, and we agree.    It "presents a single, purely legal question." <u>Whitehouse</u>, 199 F.3d at 34; <u>see also</u> <u>Commodity Trend Serv.</u>, 149 F.3d at 687 n.3.    Project Veritas also has adequately shown that it has refrained from some secret recording that it would undertake but for Section 99's bar, <u>Project Veritas Action Fund</u>, 244 F. Supp. 3d at 262, which the

- 63 -

District Attorney has previously enforced, see Martin, 340 F. Supp. 3d at 93-94.

The District Court rejected Project Veritas's facial overbreadth claim on the merits, however, and it is that ruling that Project Veritas challenges on appeal. We see no error.

A law may be invalidated in its entirety under the First Amendment overbreadth doctrine only "if 'a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" United States v. Stevens, 559 U.S. 460, 473 (2010) (quoting Wash. State Grange v. Wash. State Republican Party, 552 U.S. 442, 449 n.6 (2008)). The District Court determined that Project Veritas's overbreadth challenge failed, because "[m]ost" of the statute's applications are constitutional. Project Veritas Action Fund, 244 F. Supp. 3d at 266.

Project Veritas does identify ten examples of applications of Section 99 that it argues are unconstitutional and that "[o]ne can expand these ten examples almost exponentially to grasp the amazing breadth and reach of this law." But, by looking solely at one half of the equation, Project Veritas fails to show, as it must, that the unconstitutional applications are "substantial" relative to the extensive range of applications it does not even challenge. We thus affirm the District Court's

rejection of Project Veritas's First Amendment overbreadth challenge.

**B.**

There remain the challenges to the District Court's rulings on Project Veritas's two more narrowly targeted attempts to show that Section 99 violates the First Amendment insofar as it bars certain types of recording. In the first of these attempts, Project Veritas contends that the statute is unconstitutional insofar as it prohibits the secret, nonconsensual audio recording of any person who does not have a reasonable expectation of privacy in what is recorded. In the second, Project Veritas contends that the statute is unconstitutional insofar as it prohibits the secret, nonconsensual audio recording of all government officials discharging their official duties in public spaces.

The District Court ruled against Project Veritas on the merits as to the former claim but for Project Veritas on the merits as to the latter. Id. at 265; Martin, 340 F. Supp. 3d at 108. Thus, we confront an appeal by Project Veritas as to that first ruling and an appeal by the District Attorney as to the second. As we will explain, we conclude that neither of the underlying challenges to Section 99 is ripe.

Our conclusion, we emphasize, does not turn on any skepticism that, but for Section 99, Project Veritas would engage in the investigations it describes itself as intending to

- 65 -

undertake.  See Torres-Negrón v. J & N Recs., LLC, 504 F.3d 151, 163 (1st Cir. 2007) (explaining that, in the event that "the plaintiff presents sufficient evidence to create a genuine dispute of material (jurisdictional) facts," the case must survive a motion to dismiss).  Instead, as we will explain, it rests on the fact that Project Veritas has not sought relief in bringing these challenges that is more congruent in scope to an articulated set of planned investigations.  For that reason, we conclude that the organization through these challenges impermissibly seeks to transform our First Amendment inquiry "from a necessary means of vindicating [a party's] right not to be bound by a statute that is unconstitutional into a means of mounting gratuitous wholesale attacks upon state and federal laws."  Renne, 501 U.S. at 324 (quoting Bd. of Trs. of State Univ. of N.Y. v. Fox, 492 U.S. 469, 484-85 (1989)).

### 1.

We begin with Project Veritas's First Amendment challenge to Section 99 insofar as it bars the secret recording of "individuals who lack[] any reasonable expectation of privacy." In a response to interrogatories from the District Attorney, Project Veritas explained that it "defines 'reasonable expectation of privacy' as a circumstance in which the parties to the communication may reasonably expect that the communication may not be overheard or recorded."

That vague yet sweeping definition, however, is problematic from the perspective of the ripeness inquiry. It fails to ensure that the "contours" of this challenge to Section 99 are "sharply defined." Stern v. U.S. Dist. Ct., 214 F.3d 4, 10 (1st Cir. 2000); cf. Whitehouse, 199 F.3d at 32 (reviewing claim where the "parameters of the activity that [the plaintiff] proposed to undertake were discrete and well-defined").

This lack of precision also prompts the concern that it is merely "conjectural to anticipate" that Section 99 will ever be applied in many of the distinct contexts to which Project Veritas's challenge to that measure -- by the organization's own terms -- extends. Babbitt, 442 U.S. at 304. That Project Veritas has emphasized to us that it intends to record "newsworthy" content "in which the public has a legitimate concern" but has made no effort to cabin its request for relief accordingly only exacerbates the disconnect between the alleged intended action and the requested relief. And that concern about adjudication of hypothetical rather than real disputes looms even larger when one considers the ways in which the First Amendment analysis could be affected by the types of conversations that are targeted.

In this respect, Project Veritas's claims are distinct from those brought in Mangual v. Rotger-Sabat, on which the organization relies heavily for its jurisdictional arguments. See 317 F.3d at 59-60. There, the plaintiff sought declaratory and

- 67 -

injunctive relief to the effect that Puerto Rico's criminal libel statute incorporated constitutionally deficient standards with regard to statements about public officials or figures.  See id. at 51-52, 69.  The scope of that pre-enforcement protection was coextensive with the plaintiff's alleged plans to continue working as an investigative journalist and publish statements about public figures.  See id. at 58, 69.

Nor is Project Veritas's reliance on the Seventh Circuit's analysis in Alvarez helpful to its cause.  As we explained in our analysis of the ripeness of the Martin Plaintiffs' challenge, see supra Section II.A.2, Alvarez concerned a very different plan of recording -- that the ACLU intended to "use its employees and agents to audio record on-duty police officers in public places," 679 F.3d at 593.  That plan was congruent to the ACLU's request for relief, which sought pre-enforcement protection for that very same activity.  Id. at 588.

Accordingly, we conclude not merely that the challenge raises "serious ripeness concerns," as the District Court recognized, Martin, 340 F. Supp. 3d at 104, but that those concerns are so serious that Article III precludes this challenge from going forward in its present state.  We thus must vacate the District Court's merits-based ruling on the ground that this aspect of Project Veritas's challenge to Section 99 must be dismissed on ripeness grounds.

**2.**

Project Veritas's First Amendment challenge to Section 99's bar to the secret, nonconsensual audio recording of "government officials discharging their duties in public spaces" raises similar ripeness concerns.  In a response to interrogatories from the District Attorney, the organization defined the phrase "government officials" as broadly as we can imagine, explaining that it intended to refer to "officials and civil servants."[5]

That definition is of concern with respect to ripeness because Project Veritas has described its planned investigations in terms that are not nearly so broad.  Project Veritas alleged in connection with this challenge that it seeks to record "government officials who are discharging their duties at or around the State House in Boston and other public spaces" in hopes of learning those officials' unvarnished thoughts about "immigration policy and deportation"; "to capture whether antifa public events and protests are peaceful, whether police or other public officials' interactions with antifa members are non-violent," and to

---

[5] Project Veritas also listed the Black's Law Dictionary definition of each term.  See Official, Black's Law Dictionary (10th ed. 2014) ("Someone who holds or is invested with a public office; a person elected or appointed to carry out some portion of a government's sovereign powers. -- Also termed public official."); Civil Servant, Black's Law Dictionary (10th ed. 2014) ("Someone employed in a department responsible for conducting the affairs of a national or local government. -- Also termed public employee.").

otherwise report on those events; and that its "journalists would have attended" "a large public event" related to "the ongoing PVA 'antifa' investigation" but for Section 99.

Thus, Project Veritas gives no indication that it intends to investigate any and every type of civil servant, no matter their function or place in the governmental hierarchy. But, if we take Project Veritas at its word and construe the term "government officials" as broadly as "officials and civil servants," that category covers everyone from an elected official to a public school teacher to a city park maintenance worker.

The contrast between the narrowness of Project Veritas's plans and the breadth of the remedy that it has requested leads to the concern that it has not adequately shown that it intends to engage in much of the conduct covered by the relief it seeks. Cf. Ohio Forestry Ass'n v. Sierra Club, 523 U.S. 726, 735 (1998) ("The ripeness doctrine reflects a judgment that the disadvantages of a premature review that may prove too abstract or unnecessary ordinarily outweigh the additional costs of -- even repetitive -- [more focused] litigation."). The concern that this disconnect renders this dispute hypothetical and abstract rather than real and concrete is compounded by the fact that the First Amendment analysis might be appreciably affected by the type of government official who would be recorded. It is hardly clear that a restriction on the recording of a mayor's speech in a public park

gives rise to the same First Amendment concerns as a restriction on the recording of a grammar school teacher interacting with her students in that same locale while on a field trip or public works employees conversing while tending to a city park's grounds.

Thus, we conclude here, too, that the disparity between plan and challenge is too great for us to conclude that there is a live case or controversy as to Section 99's enforcement in the context of the full spectrum of "government officials discharging their duties in public spaces." For that reason, we vacate the District Court's ruling on the merits of Project Veritas's challenge to Section 99 insofar as it applies to bar the secret, nonconsensual audio recording of any "government official" discharging official duties in public spaces. Instead, we hold that this challenge must be dismissed without prejudice for lack of Article III jurisdiction on ripeness grounds.

## IV.

The privacy that we enjoy, even in public, is too important to be taken for granted. Cf. Carpenter v. United States, 138 S. Ct. 2206, 2217-18 (2018) (first citing United States v. Jones, 565 U.S. 400, 430 (2012) (Alito, J., concurring in judgment), then citing id. at 415 (Sotomayor, J., concurring)). But, so, too, is the role that laypersons can play in informing the public about the way public officials, and law enforcement in particular, carry out their official duties.

We conclude that, by holding that Section 99 violates the First Amendment in criminalizing the secret, nonconsensual audio recording of police officers discharging their official duties in public spaces and by granting declaratory relief to the Martin Plaintiffs, the District Court properly accounted for the values of both privacy and accountability within our constitutional system. We further conclude that the District Court properly rejected Project Veritas's First Amendment overbreadth challenge, in which the organization sought to invalidate the measure in its entirety, given the substantial protection for privacy that it provides in contexts far removed from those that concern the need to hold public officials accountable. Finally, we vacate and remand the District Court's rulings as to the remainder of Project Veritas's challenges, because, in their present state, they ask us to engage in an inquiry into sensitive and difficult First Amendment issues -- concerning both privacy in public and government accountability -- that is too likely to be a hypothetical one, given the disconnect between the organization's concrete allegations regarding its intentions and the breadth of the relief it seeks. We thus affirm the District Court's judgment in the Martin Plaintiffs' case and affirm in part and vacate and remand in part its judgment in Project Veritas's. The parties shall bear their own costs.