1                    IN THE UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF MASSACHUSETTS
2

3   K ERIC MARTIN, et al,                    )
                                             )
4                     Plaintiffs             )
                                             )
5             -VS-                           )  CA No. 16-11362-PBS
                                             )  Pages 1 - 20
6   GREGORY LONG, et al,                     )
                                             )
7                     Defendants             )

8

9                **STATUS CONFERENCE BY VIDEO**

10            BEFORE THE HONORABLE PATTI B. SARIS
                  UNITED STATES DISTRICT JUDGE
11

12

13

14

15                              United States District Court
                                1 Courthouse Way, Courtroom 19
16                              Boston, Massachusetts  02210
                                August 2, 2021, 2:29 p.m.
17

18

19

20

21

22

23                      LEE A. MARZILLI
                     OFFICIAL COURT REPORTER
                   United States District Court
24                 1 Courthouse Way, Room 7200
                      Boston, MA  02210
25                     leemarz@aol.com

```
 1    A P P E A R A N C E S:

 2         JESSIE J. ROSSMAN, ESQ., ACLU of Massachusetts,
      211 Congress Street, 3rd Floor, Boston, Massachusetts,
 3    02110, for the Plaintiffs.

 4         WILLIAM D. DALSEN, ESQ., Proskauer Rose LLP,
      One International Place, Boston, Massachusetts, 02210-2600,
 5    for the Plaintiffs.

 6         NIEVE ANJOMI, ESQ., City of Boston Law Department,
      One City Hall Plaza, Room 615, Boston, Massachusetts, 02201,
 7    for the Defendant Gregory Long.

 8         ERIC A. HASKELL, ESQ., Attorney General's Office,
      18th Floor, One Ashburton Place, Boston, Massachusetts,
 9    02108, for the Defendant Rachael Rollins.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                    P R O C E E D I N G S

2            THE CLERK:  Hi, Judge.

3            THE COURT:  Hi.  Good morning to everyone.

4            THE CLERK:  Everybody's on.  I will call the case.

5            THE COURT:  Thank you.

6            THE CLERK:  The Court calls Civil Action 16-11362,

7   Eric Martin v. Gregory Long.  Could counsel please identify

8   themselves.

9            MS. ROSSMAN:  Good afternoon, your Honor.  Jesse

10   Rossman on behalf of the plaintiffs, and with me here today

11   is Attorney William Dalsen.

12            THE COURT:  Thank you.

13            MR. DALSEN:  Good afternoon, your Honor.

14            MR. ANJOMI:  Good afternoon, your Honor.  Nieve

15   Anjomi on behalf of Gregory Long.

16            MR. HASKELL:  Hello.  My name is Eric Haskell.  I

17   am an Assistant Attorney General, and I represent the other

18   defendant, District Attorney Rollins.

19            THE COURT:  Thank you.  All right, so I know that

20   the interesting, important, substantive issues have long

21   since been resolved, but this is one lingering issue which

22   is attorneys' fees, and I was surprised when you couldn't

23   work out a settlement.  So I thought, rather than just set a

24   briefing schedule since -- you know, I view attorneys' fees

25   litigation like acid reflux.  I mean, it's sort of, you
```

1    know, like, you've been through all of this, and suddenly

2    you're nitpicking; you know, it's this hour for this and this

3    rate for that.  I'm just trying to figure out what the big

4    holdups are so I can see if maybe I can sort of maybe break

5    through some of them.

6              So maybe from the plaintiffs first, what do you view

7    as sort of the big issue?

8              MS. ROSSMAN:  Sure, your Honor.  You know, plaintiffs

9    have been and remain open to serious negotiations.  As part of

10   our process on our end, we gathered documentation from the

11   years of litigation, including time sheets, expenses.  And we

12   also, for the purposes of settlement negotiation, had gone

13   through and omitted certain fees and costs, while reserving the

14   right, of course, to ask that if the parties couldn't agree,

15   gathered all of that up into a package to send --

16             THE COURT:  So is it mostly, Ms. Rossman, your hours,

17   or is it also Proskauer's?

18             MS. ROSSMAN:  It is both myself, your Honor, and

19   Attorney Dalsen.

20             THE COURT:  And were you charging big-law rates?  Is

21   that one of the issues?

22             MR. DALSEN:  Yes, your Honor.  William Dalsen from

23   Proskauer.  We are charging -- the time sheets that we sent to

24   the defendants do reflect rates with a slight discount to them

25   for Proskauer.  But to answer your question, to our knowledge,

1    it's not the rates that is an issue in negotiation, and I think

2    Ms. Rossman --

3              THE COURT:  Well, how much did you charge per hour?

4              MR. DALSEN:  I can tell you in one moment, your Honor.

5              MR. ANJOMI:  I can tell you, your Honor, $1,350 an

6    hour, between $650 and $1,350 an hour.

7              THE COURT:  So $650 for an associate and $1,350?

8              MR. ANJOMI:  So $650 for Ms. Rossman, up to $1,350 for

9    Mr. Dalsen.

10             MR. DALSEN:  I'll say I don't --

11             THE COURT:  Is that an issue in this debate?

12             MR. ANJOMI:  Yes, your Honor, from the City's

13   perspective, yes.

14             MS. ROSSMAN:  And if I may just say, your Honor, this

15   is part of the issue of the holdup.  You asked what the holdup

16   might be.  I think, if I can narrow in on that, I think the two

17   pieces, the response we got back from the defendant when we

18   sent over our demand was much lower than what we intend to

19   agree with, a very significant gap between the two; and there

20   wasn't any engagement with the documentation that we had sent

21   over.  Actually, this is the first time --

22             THE COURT:  I'm sorry.  I just didn't hear you,

23   Ms. Rossman.

24             MS. ROSSMAN:  Oh, sure, no problem.  I can speak up,

25   your Honor.  There was no engagement with the documentation

1    that we had sent over to defendants.  This is actually the

2    first time that I've heard that there was any question about

3    the rates.

4            THE COURT:  Well, $1,350 is extremely high, extremely

5    high for Boston.  Let's just start there.  $650 is not

6    extremely high; $1,350 is extremely high.  In fact, that's at

7    the top end of what they charge in New York.  So I'm wondering

8    whether that's a room for compromise.

9            So let me ask, from the government's point of view,

10   what are your problems?  So is it more than rate?  Is it the

11   hours billed?  What is it?

12           MR. ANJOMI:  From the City's perspective, both, your

13   Honor.  The total bill that the City received, and in their

14   position as it's discounted, is $1.1 million, approximately

15   $1.1 million.  Now, Attorney Haskell and I have been working

16   out the other aspect, which is what we believe the City is

17   responsible versus the Commonwealth, but we've been having a

18   good working relationship on that issue.  It's the total hours

19   and the billable rates.

20           THE COURT:  Well, you've got to give me more than

21   that.  You guys have been talking this through.  It can't just

22   be that $1.1 million sounds like a lot of money because there

23   were aggressive motions to dismiss, standing issues, motions

24   for reconsideration, motions for summary judgment, appeals.  I

25   mean, there was a lot going on here.  So I need you to be very

1    granular.  I mean, do you think, were too many associates

2    charged for a particular task?  Was there too many hours for a

3    particular task?  I mean, I hate to say it, this is bean

4    counting at this point.

5         MR. HASKELL:  I think I might be able to expand on

6    that, your Honor, if I can.  So like Mr. Anjomi said, we

7    started with this, this $1.1 million demand by plaintiffs.  And

8    what I did myself was kind of a line-by-line analysis of

9    everything, at least to determine what we felt was an

10   appropriate settlement value, and we came up with a number.

11   Our reasons for coming up with that number, which I'll get to

12   in a moment, really flows from two things:  One is the rates.

13   The rates, in our view, are just off the charts.  And then the

14   second is significant instances of things that we didn't

15   believe were compensable.  The chief culprits we saw were a lot

16   of double staffing, sending two lawyers to do something that

17   only one lawyer was needed for; and then, in addition, a lot of

18   block billing, sometimes entries as large as 15 or 16 hours in

19   a day with minimal explanation what was done with those 15 or

20   16 hours.  So we didn't chop those entirely; we applied

21   discounts, and after applying those discounts, we came up with

22   a figure that we believed was appropriate.  I have obtained

23   settlement authority for that figure.

24        And in response to the $1.1 million, we, Mr. Anjomi

25   and I -- I guess it was last week or the week before --

1   communicated to the plaintiffs that we felt, you know, a

2   starting response to their offer was around $200,000 that we

3   had and were willing to negotiate upwards from that, but that

4   ultimately we probably wouldn't be able to resolve the case for

5   a half million dollars or in that range.

6          THE COURT:  From the Attorney General's point of view,

7   what are the rates that you've paid for private firms in civil

8   rights litigation in this state?

9          MR. HASKELL:  Yeah, we actually have a schedule that

10  we use internally for calculating that; and for attorneys, it

11  depends on the experience of the attorney, but for attorneys of

12  Ms. Rossman's and Mr. Dalsen's experience, we're talking

13  somewhere between $250 and $300 an hour.

14         THE COURT:  Can I say that that's outdated, okay?  So,

15  I mean, there's got to be something in between.  $1,350, I just

16  had a huge insurance litigation where I found Kirkland & Ellis

17  was at $1,400, which was the most expensive law firm in New

18  York City.  So I'm not paying top rates.  It's not happening.

19  On the other hand, $250 is, frankly, what you get for a

20  standard disability discrimination or a standard $250, $350

21  excessive force case.  I mean, this wasn't that.

22             So I'm pretty experienced too, either fortunately or

23  unfortunately for you because I see these things, so there's

24  got to be some understanding about how much it makes sense for

25  a sophisticated, important piece of civil rights litigation

1    that is not top dollar against the City of Boston and the

2    Commonwealth.  I mean, the taxpayer is paying that.  I'm not

3    going to do that.  But $250 is unrealistic.  That's just

4    unrealistic.  I think I was awarding that ten years ago or

5    fifteen years ago for smaller litigations.  So that's why I

6    wanted to hold this and not just push this off to briefing.

7         Now, on block billing, that's a problem for you.  If

8    it's a 15-hour block bill, you know, I'm not going to -- you

9    know, that's a problem under the law.  But as Mr. Haskell

10    points out, it doesn't mean you get nothing.  It means you get

11    something, and I have to try and figure it out.  But it will

12    take me an eternity to go through every bill.  How long did

13    this case go, five, six years or something like that?  So is it

14    possible -- and double staffing, though, Mr. Haskell, if it's

15    coming to court, everyone brings two lawyers to court.  I mean,

16    three or four lawyers just to teach a summer associate, I mean,

17    that's a different story; but if it's two, well, that's not so

18    outlandish, it's just not.  And so if it's a big hearing like a

19    summary judgment hearing, everyone shows up with two people.

20         So I'm trying to get through some of this, but there

21    were, I don't know, and I don't remember -- I do remember that

22    the ACLU was pretty reasonable, in that it wasn't such a

23    cutting-edge litigation, as much as I like Ms. Rossman and

24    Mr. Dalsen, in the sense that there was a First Circuit case

25    that basically said it.  It wasn't like I was -- the real

1   creative stuff came from *Project Veritas* in terms of the ones

2   that really pushed the boundaries a huge amount.

3           So I'm just trying to get to a reasonable number, and

4   I didn't know whether there would be something between -- if

5   the two of you could just literally go through the bills.  You

6   said you've done the line by line, so you're a step ahead of, I

7   guess, a lot of people.  Have you gone through, Ms. Rossman?

8           MS. ROSSMAN:  Your Honor, we have provided all of the

9   documentation per request.  I have not seen actually any

10  explanation of the line by line that's happened so far for

11  defense counsel.  It would be extraordinarily helpful.  Like I

12  said, we remain open to negotiations.

13          THE COURT:  Well, maybe with block billing you get

14  half -- I'm making up numbers, benchmarks -- if it's a block

15  billing of 15 hours, or if it's, for example, three or four

16  people showing up at an event.  I don't remember well enough,

17  but I do -- because there's both *Project Veritas* and you, so I

18  don't remember how many per side came.  I don't remember.

19          MS. ROSSMAN:  Your Honor, I can say off the bat, in

20  terms of our -- again, for the purposes of negotiations, this

21  is one of the things that we had indicated in the packet we

22  sent over, that we had limited the attorneys that we were

23  charging for to just myself and Mr. Dalsen.  If there are

24  additional pieces, items with respect to -- we're hearing for

25  the first -- we're hearing about that -- if there are entries

1    they have concerns about or areas they want to discuss, we're

2    happy to discuss the reasons and see if we can reach

3    negotiations.

4           THE COURT:  So who did you go to as a mediator?

5           MS. ROSSMAN:  This was direct communications, your

6    Honor, between counsel.

7           THE COURT:  Because my worst-case scenario, which

8    happens all the time, is, if you don't settle it, what ends up

9    happening is, I try to be Solomonic, and I will cut the salary.

10   I mean, I certainly am not going to award $1,350, but, you

11   know, I'll award something more than $250.  So then I come back

12   with something that I think is reasonable based on what other

13   judges are awarding -- I haven't done a current search on it,

14   but, anyway -- for civil rights litigation, not for securities

15   fraud, civil rights litigation, and I'll come up with a current

16   rate.  And then I will have to say, well, yes to this, no to

17   this, provide a better explanation for this; and then you have

18   to go back and do it again.  So it's not even as if it's the

19   end of it.  It will take you three months to brief, it will

20   take me three months to rule, and then almost in all of these

21   cases I send it back again to recalculate.  So I am trying to

22   spare you all from that because we're talking about nine months

23   before you're getting any money.  So I know there was a request

24   to cancel this today, but I thought there should be a little

25   bit of a reality check here.

1            So other than the double billing and the two

2      attorneys, was there another generic issue?

3            MR. ANJOMI:  There was, your Honor.  There was some

4      discovery that at least the City thought was excessive.  There

5      were quite a few depositions taken that we don't believe were

6      necessary for resolving the case.

7            THE COURT:  Like what?

8            MR. ANJOMI:  They took a lot of depositions into

9      certain PPD officers that we don't think advanced the summary

10     judgment motion.

11           THE COURT:  I don't remember it well enough to help

12     you on that, but like, say, what was it, "what do you do when

13     somebody's videotaping" kind of deposition?

14           MR. ANJOMI:  I don't recall off the top of my head,

15     your Honor.

16           THE COURT:  Well, let me just say this:  I don't know

17     the answer to that, but my guess is, that's only a few hours

18     here and a few hours there.  I mean, my guess is, those aren't

19     the big systemic ones.  The ones that were really helpful were

20     the training ones; you know, how are people trained or what

21     manuals were people using?  So I don't remember, but my guess

22     is, all right, let's say there were six police officers where

23     maybe only three were necessary, but that's not much time, so I

24     don't want to have a whole battle over that.

25           So was any of this shared with *Project Veritas*?  In

1    other words, were there attorneys for both sides represented

2    there?

3              MS. ROSSMAN:  No, your Honor.

4              THE COURT:  It was all separate?

5              MS. ROSSMAN:  Yeah, I mean, this information in terms

6    of the reasons was not shared with us either until today, but

7    the conversations in terms of the settlement were just between

8    the parties here.

9              THE COURT:  Well, I'm hoping this is -- so, now, are

10   there any other generic issues?

11             MR. ANJOMI:  Not off the top of my head, your Honor.

12             THE COURT:  This sounds very settleable.  Sometimes

13   one big issue is -- I don't remember this, for example, whether

14   or not there was one big issue that took a lot of time that

15   plaintiffs lost.  My guess is, most of that came under the

16   *Project Veritas* heading, but I don't really remember.

17   Sometimes you have a discount for that, and sometimes -- but I

18   think it's outdated.  Is there now a distinction between

19   in-court and out-of-court time or time that could have been --

20   I don't know if that's still viable theory, since it was in the

21   past.  In other words -- and, also, you shouldn't be charging

22   for lawyer time to do photocopying and that sort of thing, and

23   you shouldn't be charging top dollar for photocopies that's

24   done in-house, those kinds of things.  Those are things I've

25   seen in the past, kind of thing.  But at the end of the day, if

1    you sort of are reasonable on how much you charge for

2    photocopying or the amount of time out of court with attorney

3    conferences -- like sometimes, you know, like, you spend four

4    hours, and it just says "attorney conference" -- just to be

5    reasonable in how you think about that.  You're going to get to

6    a number than I'm going to get to much more quickly.

7            So I know you have agreed on a schedule, but I didn't

8    like the schedule because I wanted first -- I don't think

9    plaintiffs can do an opening brief and defendants have a

10   response till they find out what the issues are.  So what I

11   suggest is, Mr. Haskell and Mr. Anjomi, can you both meet by

12   Zoom or by any other means and go through this from a granular

13   way and flag the things you've got the biggest problems with --

14   like, that 15-hour block billing sticks out -- and then what

15   your issues are?  And then can you do that -- like, today is

16   what, August 2?  Can you do that by Friday?  Is anyone going on

17   vacation?  Am I destroying anyone's vacation?

18            MR. ANJOMI:  (Inaudible.)

19            THE COURT:  I couldn't hear you.  I'm sorry.

20            MR. ANJOMI:  I'm out Friday and Monday, your Honor.

21            THE COURT:  Okay.  Well, you're going to stay on that

22   vacation.  I believe in attorneys' vacations.  So how about if

23   you were to by Thursday just go through it -- I don't mean a

24   brief, I don't mean anything -- literally go through and say

25   "too many lawyers, block billing, too much for photocopying,"

1   et cetera, that sort of thing, and then come up with what you

2   think is a reasonable -- look at recent things that you've all

3   paid for more sophisticated litigation.  Like, Mr. Haskell, I

4   think we've had more sophisticated litigation, civil rights.

5   Like, I've had some on the police and firefighters, like, how

6   much are people charging, that kind of thing, that's a little

7   bit more, I don't know -- I use the word "sophisticated," but I

8   don't want to be a snob -- involved a little bit more

9   complexity.  And if you could, like, Mr. Anjomi, some of these

10  wrongful incarceration things that you see, like, the more

11  sophisticated attorneys, if you will, how much, you know --

12  just give them the range of what you pay for partners and

13  associates and that.  I don't believe that Proskauer regularly

14  gets 13 -- what did you say it was?

15          MR. ANJOMI:  $1,350.

16          THE COURT:  -- $1,350.  Mostly these big firms do some

17  sort of blended rates.  And I don't know where $650 came from.

18  I don't know whether that's something -- but it would be useful

19  to know whether that's top dollar that the ACLU gets or whether

20  that's --

21          MS. ROSSMAN:  It is what was awarded recently in the

22  *Pesce* case before Judge Casper.

23          THE COURT:  For what?

24          MS. ROSSMAN:  The rates are commensurate with what was

25  awarded by Judge Casper recently in the *Pesce* case with the

1   ACLU.

2           THE COURT:  Which decision was that?

3           MS. ROSSMAN:  The *Pesce* case, your Honor.

4           THE COURT:  How do you spell that?

5           MS. ROSSMAN:  P-e-s-c-e.

6           THE COURT:  I don't know that.  Was that the

7   surveillance at the airport?

8           MS. ROSSMAN:  No.  It had to do with access to

9   medication for opioid abuse disorder in jail and prisons.

10          THE COURT:  All right, so, see, those kinds of

11  benchmarks are useful to me actually, like, what has a court

12  actually awarded in Boston?

13          So I guess that's about the extent of it.  So if you

14  provide that by Thursday so you have a lovely vacation for the

15  long weekend, and then that means, when you do your opening

16  brief, you can address issues that there are issues about, all

17  right, and justify your rates based on analogous litigation in

18  Boston.  And then you can file a response that makes sense.

19  But my hope is that in the interim, after you get their -- you

20  could make a phone call and try and settle it so you're not

21  writing that brief on August 30.  When is your vacation, from

22  the plaintiff's point of view?

23          MS. ROSSMAN:  I will be out, your Honor, from the 16th

24  to the 20th, and I also have some time around Labor Day.

25          THE COURT:  I mean, right.  Mr. Dalsen, I'm assuming

1    everybody in New England -- it's the dog days of August -- you

2    just disappear is what you do, and you sit on a beach, if it

3    ever stops raining, and you read a book.  So this has been

4    lingering so long, I'm not here to destroy anyone's vacation,

5    but what I don't want is this huge battle on issues that are

6    resolvable.  Judge Young sometimes writes on what the standards

7    in the area are.  I recently saw a Americans with Disabilities

8    case which, like, was $250, $300, and that was real barebones,

9    cookie-cutter litigation, so that's why I'm thinking that

10   that's not my rubric, so --

11          MS. ROSSMAN:  Your Honor, am I understanding correctly

12   that the defense counsel will be sending over to us (Inaudible)

13   so that we would be able to -- we are open to continuing

14   negotiations.

15          THE COURT:  Yes, and I don't want a sophisticated

16   brief, just literally a photocopy of the bill with a

17   handwritten thing that says "block billing" or "rates too

18   high," whatever it is.

19          Did you all use paralegals?

20          MS. ROSSMAN:  Your Honor, yes, we did, but we also

21   limited it to the two paralegals in the case in terms of for

22   the purposes of settlement negotiations.

23          THE COURT:  Sometimes that lowers the cost when

24   they're doing the document review, but also, in general, at

25   least on the criminal side, they're only getting between $75

```
1    and $100 an hour.  So the theory is, is to bring down the cost.

2    Anyway, I'm just making it up because I have no idea what you

3    charged or how much you used them, but I'm hoping that you can

4    have some sort of -- this was an important piece of litigation,

5    let me just say that, because it took a holding in a different

6    area and made it quite clear in a way that was affirmed by the

7    First Circuit.  Did anyone appeal it to the Supreme Court?

8              MR. HASKELL:  Veritas did.

9              THE COURT:  Veritas did, I know.  They're trying to

10   reverse me because they said I was too narrow and it should

11   apply to everyone, right?

12             MR. HASKELL:  They're actually trying to reverse the

13   First Circuit, your Honor.  They want to go back to what you

14   did.

15             THE COURT:  Oh, they're not trying to go back to

16   private individuals?

17             MR. HASKELL:  I'm sorry, that's a piece of it too, but

18   they want what you did back on the government.

19             THE COURT:  Oh, on the other government officials,

20   yes.

21             MR. HASKELL:  That's right.

22             THE COURT:  Well, regardless of it, it's important.  I

23   mean, occasionally my Courtroom Deputy gets little emails or

24   something from people, like, "What do I do, this happened?"  I

25   mean, it's having an impact, and so it was a worthwhile -- of
```

1    course, I can't comment on that, but, you know, I'm just

2    noticing that people are aware of the right, federally found

3    right to do that without getting arrested.  Is it working, just

4    out of curiosity?  Are people not getting arrested anymore for

5    it?

6              MR. ANJOMI:  I don't believe so, your Honor.

7              THE COURT:  You don't think people are getting

8    arrested anymore?

9              MR. ANJOMI:  Not at City hall when they come in with

10   their cameras.  No one is getting arrested.

11             THE COURT:  Good.  Are you hearing of anything,

12   Ms. Rossman or Mr. Dalsen?

13             MS. ROSSMAN:  Not offhand that I can think of right

14   now, your Honor.  I can update you if I have any other

15   information.

16             THE COURT:  I'm just curious as to whether it's had

17   its effect.  Okay --

18             THE CLERK:  Judge, it's Mem.  Is there a briefing

19   schedule or not?

20             THE COURT:  I'll adopt their briefing schedule, but I

21   did something in the interlude.  And, also, since I want

22   Ms. Rossman to have a vacation, I would give her a week's

23   continuance, if she needed one, and, Mr. Dalsen, you too

24   because it just seems like that's sort of a bad week.  The rest

25   of it, you're back in the saddle in October.  We're all back,

1    so -- okay?  Good luck.  I hope I don't see you again, but if I

2    do, it takes a while for me to do this.  So thank you.  Bye.

3            MS. ROSSMAN:  Thank you, your Honor.

4            THE COURT:  Good luck.  Stay safe.

5            (Adjourned, 2:56 p.m.)

C E R T I F I C A T E

UNITED STATES DISTRICT COURT )
DISTRICT OF MASSACHUSETTS    ) ss.
CITY OF BOSTON               )

          I, Lee A. Marzilli, Official Federal Court Reporter,

do hereby certify that the foregoing transcript, Pages 1

through 20 inclusive, was recorded by me stenographically at

the time and place aforesaid in Civil Action No. 16-11362-PBS,

K Eric Martin, et al v. Gregory Long, et al, and thereafter by

me reduced to typewriting and is a true and accurate record of

the proceedings.

          Dated this 6th day of August, 2021.




                    /s/ Lee A. Marzilli
                    _____
                    LEE A. MARZILLI, CRR
                    OFFICIAL COURT REPORTER